[No. 35487-6-I.   Division One.   July 22, 1996.]

CTVC of Hawaii Co., Ltd., et al., *Appellants*, v. Dr. Thaksin Shinawatra, et al., *Respondents*.

*Richard W. Pierson* and *Peery, Hiscock, Pierson, Kingman & Peabody*; and *Catherine Wright Smith* and *Edwards, Sieh, Hathaway, Smith & Goodfriend, P.S.*, for appellants.

*Howard D. Stambor, Bergitta Trelstad*, and *Davis Wright Tremaine*, for respondents.

Cox, J. — CTVC of Hawaii Co., Ltd. (CTVC), and TV Systems Co., Ltd. (TV Systems), both of which are Washington corporations, agreed with several foreign corpora-

tions on a project to provide cable television service to Bangkok, Thailand. Disputes arose among the parties, and CTVC and TV Systems sued the foreign corporations and others in Washington. The trial court summarily dismissed the foreign corporations and other defendants from the action. Because Washington lacks personal jurisdiction over the foreign corporations and the other defendants, we affirm.

TV Systems and CTVC are subsidiaries of Clearview International, Ltd. (Clearview), a Washington corporation. William Monson controls these three corporations. In the mid-1980s, Monson decided to develop a cable TV network in Thailand by using Clearview as the corporate entity to do business there. In 1983, Clearview established a Bangkok office.

In 1985, Clearview sought assistance in dealing with Thai government officials from Dr. Thaksin Shinawatra, a Thai national and former Thai police official. Dr. Shinawatra allegedly had access to the government authorities that issue licenses to broadcast in Thailand and that grant authority to import equipment and personnel into Thailand. Dr. Shinawatra controlled two Thai corporations, Shinawatra Computer Co., Ltd. (SCC), and International Broadcasting Co., Ltd. (IBC).

By a document dated October 1, 1985, TV Systems, SCC, IBC, and New Oriental Co., Ltd., agreed to form a joint venture company under the laws of Thailand. The name of the company was Video Link Co., Ltd. (Video Link), and the parties designated an address in Bangkok as its office. The stated purpose of Video Link was:

> to acquire, finance, develop, hold, manage, operate, lease, improve, sell, dispose of and otherwise invest in and deal

with all or any portion of a telecommunication related business and to engage in such business operations and to do all things reasonably necessary or incident thereto.

The parties designated TV Systems as the managing partner of the joint venture. TV Systems was also designated as agent for service of process at the Bangkok office of the joint venture.

According to Monson, the business planning for the cable operation was completed by December 1985. In early 1986, equipment and personnel were shipped from the United States to Thailand. In April 1986, the Thai government issued licenses and granted permission to import equipment and operate the cable system. By June 1986, operations were installed at hotels in Bangkok, and Clearview entered into contracts with various suppliers. In August 1986, the Thai government suspended the licenses. Monson alleges that Dr. Shinawatra then decided to "discontinue" the joint venture. CTVC continued its hotel operations by video tape distribution rather than by cable.

By a document dated March 27, 1987, TV Systems, SCC, IBC, and CTVC entered into an agreement regarding a license to transmit video signals to hotels in Thailand. These same parties, excluding CTVC, had agreed in 1985 to form the Video Link joint venture. This new agreement states, in part, that "the Joint Venture has not been finalized because of the failure of New Oriental Co., Ltd. [one of the four original joint venturers] to complete their part of the Agreement." The new agreement further provides that IBC would obtain from the Thai government the nec-

essary licenses to transmit video signals to hotels in Bangkok and maintain those licenses. It also provides that CTVC had the responsibility to obtain necessary programming. Finally, the agreement states that if "the necessary licenses are not approved within 12 months of the signing of this agreement, this agreement will be deemed to be null and void."

As of 1988, the Thai government had not issued to either Video Link or IBC a license to transmit video signals. CTVC, SCC, Video Link, and TV Systems then signed a document dated February 25, 1988. The document is on Clearview letterhead and shows a Bangkok address and telephone number for Clearview on its face. Among other things, it sets forth terms and conditions under which CTVC agreed to purchase from SCC certain equipment located in Thailand. It further provides for monthly payments for the purchase of the equipment with payments to be made "in baht [Thai currency] in Thailand or in US Dollars current exchange rates at time of each payment in the USA."

In early 1989, IBC obtained a license from the Thai government. Dr. Shinawatra then allegedly advised Monson that IBC was the exclusive holder of the license and would take over the cable operation. Dr. Shinawatra also proposed that Clearview only supply the equipment and programming.

In May 1989, CTVC, TV Systems, and Clearview commenced an action in King County Superior Court against Dr. Shinawatra, his wife, Potjamin Shinawatra, SCC, IBC, and others not involved in this appeal. The original complaint alleged various breach of contract claims. Dr. Shinawatra moved for summary judgment. In December 1991,

the trial court granted partial summary judgment dismissing the contract claims against Dr. Shinawatra individually. Shortly thereafter, in its Order to Amend Partial Summary Judgment dated January 15, 1992, the trial court dismissed with prejudice the claims against Dr. Shinawatra for failure to state a claim, but permitted plaintiffs to amend the complaint.

Plaintiffs then filed Plaintiff's First Amended Complaint, naming Dr. Shinawatra and his wife, individually, SCC, and IBC as defendants. This amended complaint adds tort and other claims to the contract claims stated in the original complaint. In response to an order requiring them to state with more specificity the claims alleged in the amended complaint, plaintiffs filed and served Plaintiff's More Definitive Statement of Causes of Action Four Through Ten Contained in Plaintiff's Amended Complaint.

In April 1992, Dr. Shinawatra moved for summary judgment on the amended complaint for lack of personal jurisdiction and for failure to state a claim. The trial court granted the motion and dismissed the claims against him individually.

Potjamin Shinawatra, SCC, and IBC moved for summary judgment. The trial court granted their motion and dismissed these remaining defendants for lack of personal jurisdiction on September 29, 1994. Plaintiffs filed a notice of appeal, designating this order as the subject of review.

Thereafter, SCC and IBC sought attorney fees on the basis of the long-arm statute, RCW 4.28.185. In March

1995, the court awarded reasonable attorney fees to defendants by its Order Awarding Attorneys Fees.

# I

## Scope of Review

We must first determine what orders are properly before us for review. Plaintiffs assign error to seven different orders. Their first three assignments of error are to orders dismissing the original complaint for failure to state a claim. We do not review these orders for several reasons.

First, none of these orders were designated in the notice of appeal.[1] Second, plaintiffs have provided no argument with regard to these orders.[2] Plaintiffs' argument is limited to challenging the trial court's dismissal for lack of personal jurisdiction. These three orders dealt with dismissal for failure to state a claim, not lack of personal jurisdiction. Third, these orders address only the original complaint, not the amended complaint. Thus, these orders have no bearing on the summary judgment motions that were before the court after plaintiffs filed their amended complaint in early 1992.

The remaining four orders to which plaintiffs have assigned error deal with the dismissals for lack of personal jurisdiction. The order dismissing Potjamin Shinawatra, SCC, and IBC is properly before us because it was designated in the notice of appeal. The Order Awarding Attorneys Fees is likewise properly before us.[3]

---

[1] *See* RAP 5.3(a).

[2] *See* RAP 10.3(a)(5); *Pappas v. Hershberger*, 85 Wn.2d 152, 530 P.2d 642 (1975) (assignments of error not argued in brief are deemed abandoned).

[3] *See* RAP 2.4(g).

The orders dismissing Dr. Shinawatra and denying reconsideration of the dismissal are more problematic. It is not clear to us from our review of the record what the trial court's basis for dismissal was. There is an interlineation in the order of June 3, 1992, that states, with respect to Dr. Shinawatra, "[t]here were substantial contacts with this State, but they did not give rise to a cause of action." That wording could be read to mean that the court ruled that there was personal jurisdiction over Dr. Shinawatra, but that the amended complaint failed to state a claim against him. On the other hand, the same wording could be read to mean that the "substantial contacts" had nothing to do with the claims and were thus irrelevant for the purpose of establishing the existence of personal jurisdiction. The ambiguity appears to be resolved in the parties' briefs. They agree that the dismissal was based on lack of personal jurisdiction. We are therefore satisfied that the dismissal was based on lack of personal jurisdiction, not on failure to state a claim.

## II

### Long-Arm Jurisdiction

Plaintiffs argue that (a) the defendants had sufficient minimum contacts with the State of Washington, (b) the claims against defendants arose out of these contacts, and (c) the assumption of jurisdiction does not offend traditional notions of fair play and substantial justice. We consider, in turn, each of these arguments.

When the trial court considers matters outside the

pleadings on a summary judgment motion to dismiss for lack of personal jurisdiction, we review the trial court's ruling under the standard of review for summary judgment.[4] Thus, we must view the facts and reasonable inferences to be drawn therefrom in the light most favorable to the nonmoving parties.[5] In this case, the nonmoving parties are Clearview, CTVC, and TV Systems.

The party asserting jurisdiction has the burden of proof.[6] "For purposes of determining jurisdiction under the long-arm statute, the plaintiff need only show a prima facie case."[7] The trier of fact determines whether the underlying cause of action has been established.[8] Thus, for purposes of determining jurisdiction, we treat the allegations in the complaint as established.[9] Here, we consider Plaintiff's First Amended Complaint, Plaintiff's More Definitive Statement, and the other materials the trial court considered when it ruled on the motions for summary judgment.

Washington law permits a state court to exercise either general or specific personal jurisdiction over a nonresident defendant.[10] If a nonresident defendant is "transacting substantial and continuous business of such character as to give rise to a legal obligation," a Washington court may exercise general jurisdiction over that defendant. This is

---

[4]See Lewis v. Bours, 119 Wn.2d 667, 669, 835 P.2d 221 (1992); John Does v. CompCare Inc., 52 Wn. App. 688, 693, 763 P.2d 1237 (1988), review denied, 112 Wn.2d 1005 (1989).

[5]Lewis, 119 Wn.2d at 669; CompCare, 52 Wn. App. at 693.

[6]Walker, 64 Wn. App. at 32-33.

[7]Lewis, 119 Wn.2d at 670.

[8]Lewis, 119 Wn.2d at 670.

[9]Lewis, 119 Wn.2d at 670.

[10]MBM Fisheries, Inc. v. Bollinger Mach. Shop & Shipyard, Inc., 60 Wn. App. 414, 418, 804 P.2d 627 (1991).

so regardless of whether the cause of action is related to the defendant's contacts with Washington.[11]

■ In contrast, a Washington court may exercise specific jurisdiction over a nonresident defendant when the defendant's limited contacts give rise to the cause of action.[12] The claimed basis for jurisdiction here is specific jurisdiction, which is authorized by Washington's "long-arm" statute, RCW 4.28.185.

That statute provides in part:

(1) Any person, whether or not a citizen or resident of this state, who in person or through an agent does any of the acts in this section enumerated, thereby submits said person . . . to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any of said acts:

(a) The transaction of any business within this state;
(b) The commission of a tortious act within this state;

. . . .

(3) Only causes of action arising from acts enumerated herein may be asserted against a defendant in an action in which jurisdiction over him is based upon this section.[13]

■ Under the long-arm statute, a Washington court may exercise personal jurisdiction over a foreign entity, either for the transaction of business in this state or commission of a tortious act in this state, if the following factors are satisfied:

(1) The nonresident defendant or foreign corporation must purposefully do some act or consummate some transaction in

---

[11]*MBM Fisheries*, 60 Wn. App. at 418 (citing *Crose v. Volkswagenwerk Aktiengesellschaft*, 88 Wn.2d 50, 54, 558 P.2d 764 (1977)).

[12]*MBM Fisheries*, 60 Wn. App. at 422-23; RCW 4.28.185.

[13]RCW 4.28.185.

the forum state; (2) the cause of action must arise from, or be connected with, such act or transaction; and (3) the assumption of jurisdiction by the forum state must not offend traditional notions of fair play and substantial justice, consideration being given to the quality, nature, and extent of the activity in the forum state, the relative convenience of the parties, the benefits and protection of the laws of the forum state afforded the respective parties, and the basic equities of the situation.[14]

## A.
### Purposeful Availment

■ To satisfy the first factor, the plaintiff must establish that the nonresident defendant "purposefully avail[ed] itself of the privilege of conducting activities within the forum state, thereby invoking the benefits and protections of its laws."[15] The focus of the inquiry is on the defendant's activities in the forum.[16] The sufficiency of the contacts is determined by the quality and nature of the defendant's activities, not the number of acts or mechanical standards.[17]

[A state] does not acquire that jurisdiction by being the "center of gravity" of the controversy, or the most convenient location for litigation. The issue is personal jurisdiction, not choice of law. It is resolved . . . by considering the acts of the [defendant].[18]

---

[14]*Shute v. Carnival Cruise Lines*, 113 Wn.2d 763, 767, 783 P.2d 78 (1989) (citing *Tyee Constr. Co. v. Dulien Steel Prods., Inc.*, 62 Wn.2d 106, 115-16, 381 P.2d 245 (1963)); *MBM Fisheries*, 60 Wn. App. at 423.

[15]*Walker v. Bonney-Watson Co.*, 64 Wn. App. 27, 34, 823 P.2d 518 (1992) (citing *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S. Ct. 1228, 2 L. Ed. 2d 1283 (1958)).

[16]*CompCare*, 52 Wn. App. at 697.

[17]*Walker*, 64 Wn. App. at 34.

[18]*Hanson*, 357 U.S. at 254.

## 1. Business Contacts

Purposeful availment may be established by a nonresident defendant's act of doing business in Washington.[19] The contact may be "the initiation of a transaction outside the state in contemplation that some phase of it will take place in the forum state."[20] A nonresident defendant may also purposefully act in Washington even though the defendant did not initiate contact with Washington "if a business relationship subsequently arises."[21]

■ But, mere execution of a contract with a resident of this jurisdiction alone does not establish the purposeful act requirement.[22] To determine whether the defendant purposefully established minimum contacts by entering into a contract with a resident of the forum state, the court must examine the circumstances of the entire transaction. The court must evaluate prior negotiations, contemplated future consequences, the terms of the contract, and the parties' actual course of dealing.[23]

Here, plaintiffs do not argue on appeal that Potjamin Shinawatra, the wife of Dr. Shinawatra, had any contacts with Washington sufficient to support personal jurisdiction. That is wise. Our search of the record reveals only

---

[19]*See* RCW 4.28.185(1)(a).

[20]*Griffiths & Sprague Stevedoring Co. v. Bayly, Martin & Fay, Inc.*, 71 Wn.2d 679, 684, 430 P.2d 600 (1967) (jurisdiction proper over nonresident insurance broker who ordered insurance from a Washington corporation). *See also Barer v. Goldberg*, 20 Wn. App. 472, 478, 582 P.2d 868, *review denied*, 90 Wn.2d 1025 (1978).

[21]*Sorb Oil Corp. v. Batalla Corp.*, 32 Wn. App. 296, 299, 647 P.2d 514 (1982) (Texas corporation's series of purchases from Washington corporation gave rise to a business relationship and thereby constituted purposeful conduct).

[22]*MBM Fisheries*, 60 Wn. App. at 423 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478-79; 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)).

[23]*MBM Fisheries*, 60 Wn. App. at 423 (citing *Burger King*, 471 U.S. at 478-79).

limited references to her.[24] Moreover, she did not sign any of the agreements that give rise to this litigation. Plaintiffs' failure to argue on appeal that the court had personal jurisdiction over her and their failure to provide a clear explanation of how she purposefully conducted activities in this state are fatal to their claim. The trial court did not err in dismissing her from this case for lack of personal jurisdiction.

Dr. Shinawatra is the main focus of plaintiffs' arguments. They claim he purposefully conducted activities in Washington and that our courts therefore have personal jurisdiction over him. In their briefs, plaintiffs describe a number of activities conducted in Washington to support their claim that personal jurisdiction exists over Dr. Shinawatra and, through him, his corporations, SCC and IBC.

Plaintiffs first assert that Dr. Shinawatra and an associate, Mr. Chirdsak, came to Seattle to negotiate "the business relationship" and plan the implementation of cable television in Thailand. The subject of these negotiations, the 1985 joint venture, resulted in the establishment of Video Link, a Thai company under Thai law. But the record also reflects that Clearview established an office and operations in Thailand in 1983 for the purpose of establishing cable operations before Dr. Shinawatra entered the picture in 1985 at Clearview's request. It is reasonable to infer that negotiations on the 1985 joint venture also took place in Thailand. When viewed in the light most favorable to plaintiffs, the presence of Dr. Shinawatra and his associate in Washington shows that the 1985 joint venture

---

[24]Plaintiff's First Amended Complaint alleges that Dr. Shinawatra and Potjamin Shinawatra reside in Thailand, have business interests in Washington, and are officers of SCC and IBC. There is no explanation of what business interests of hers are supposed to be in Washington. There is also a statement that she caused communications to be made to Washington from Thailand, but there is no explanation of what those communications had to do with this litigation.

agreement was partially negotiated in Washington. Nevertheless, plaintiffs fail to explain how this contact establishes that Dr. Shinawatra purposefully acted in Washington.

The joint venture agreement was among four corporate entities. They were TV Systems, SCC, IBC, and New Oriental Co., Ltd. Dr. Shinawatra was also a signatory of the joint venture agreement, but only for a limited purpose. The limited purpose was to guarantee a portion of TV System's management fee as the managing partner of the joint venture. We fail to see how Dr. Shinawatra's presence in Washington to negotiate, in part, a joint venture agreement under which he guaranteed a portion of the management fee of the managing partner of a Thai joint venture meets the test of purposefully availing himself of the privilege of conducting activities in Washington, thus invoking the benefits and protections of its laws. This alleged contact is insufficient to fulfill the first factor of the jurisdictional test.

Plaintiffs also assert that a Seattle attorney prepared the original draft of the 1985 joint venture agreement in Seattle. This bare assertion is of no special significance to the question of personal jurisdiction over Dr. Shinawatra. The assertion is silent as to whether Dr. Shinawatra or someone else employed the attorney. Plaintiffs have failed to demonstrate how the mere allegation that a Seattle attorney prepared the original draft of a joint venture agreement establishes that Dr. Shinawatra was purposefully acting in Washington. Because the focus of the jurisdictional analysis is on Dr. Shinawatra's activities, this assertion is also insufficient to meet the first factor of the jurisdictional test.

Plaintiffs next assert that Dr. Shinawatra and his associates attended business dinners hosted by Clearview

employees in Seattle. For support, they cite portions of the record showing that socializing took place at dinners in Seattle. As we read the record, these references to business dealings involved *potential* business for matters unrelated to the disputes in this litigation. These activities cannot be fairly characterized as purposeful availment by Dr. Shinawatra. There is nothing to suggest that by these contacts, Dr. Shinawatra derived any legal protection or benefit in Washington.

Plaintiffs further cite travels by Dr. Shinawatra to Washington "in connection with the agreements." They generally allude to meetings with Monson's attorney, a banker, and others. But plaintiffs fail to explain how the meetings amount to purposeful contact in Washington. This lack of specificity is fatal to the claim of personal jurisdiction over Dr. Shinawatra.

Plaintiffs next claim that Dr. Shinawatra made frequent cash distributions to Clearview's operations to purchase equipment and pay operating expenses and employees in connection with the agreements. For support, they cite to the 1985 joint venture agreement. We note that Clearview was not a party to that agreement. In the joint venture agreement, only the corporate parties agreed, among other things, to make their respective capital contributions to the Thai joint venture. There is no suggestion that the contributions were destined for Washington. More importantly, Dr. Shinawatra signed the joint venture agreement only in the limited capacity of a guarantor of a portion of TV System's management fee. Again, we fail to see how these allegations show that Dr. Shinawatra was purposefully conducting activities in Washington for purposes of satisfying the first factor of the jurisdictional test.

Plaintiffs next assert that TV Systems deposited

into Washington bank accounts funds for the salaries of Video Link employees in Thailand. The record shows that on two occasions, a TV Systems employee in Thailand requested TV Systems to deposit funds in his Washington account because he could not get funds out of Thailand. But the proper focus in jurisdictional analysis is on the actions of the defendant. The activities of plaintiff TV Systems have no relation to Dr. Shinawatra and do not establish that he purposefully acted in Washington for purposes of jurisdiction.

Plaintiffs next assert that Dr. Shinawatra knew during negotiations of the joint venture that all programming would be taped in and transmitted from Washington and that the joint venture would use equipment and personnel in this state. Plaintiffs further assert that activities in Washington were performed in connection with the agreements. At best, such facts establish that Dr. Shinawatra knew that some phase of the joint venture would take place in Washington. But these facts do not satisfy the purposeful act inquiry: the proper focus is on the acts of *defendant*. Plaintiffs fail to cite any activities Dr. Shinawatra conducted in Washington. Rather, they cite activities that Clearview's employees conducted in Washington.

Plaintiffs further assert that Dr. Shinawatra "in connection with [the] agreements" was able to draw on a $25,000 line of credit at an Enumclaw bank. But the portion of the record to which they cite simply indicates that Monson "set up" this credit line for Dr. Shinawatra. There is no indication that Dr. Shinawatra ever used this credit line. Thus, plaintiffs again fail to demonstrate that Dr. Shinawatra, the defendant, has purposely acted in Washington for purposes of the first factor.

The cases upon which plaintiffs rely to support their claims of personal jurisdiction over Dr. Shinawatra are distinguishable from the facts here. All of those cases involve a nonresident defendant's purchase of products or

services from Washington corporations.[25] By doing so, they invoked the benefits and protections of Washington law. But here, Dr. Shinawatra did not transact a purchase from a Washington corporation. His participation and that of his corporations, SCC and IBC, in the joint venture, as set forth in the agreements, were limited to activities in Thailand: securing the necessary licensing from the Thai government for a cable television operation in Thailand. Such participation by Dr. Shinawatra, SCC, and IBC cannot be fairly characterized as invoking the protections or benefits of Washington law.

Plaintiffs have identified only two contacts whereby Dr. Shinawatra arguably purposely acted in Washington: (1) the transport of cash supplied by Dr. Shinawatra to purchase equipment for operations in Enumclaw and (2) the Enumclaw bank account opened by Dr. Shinawatra.

First, plaintiffs cite Dr. Shinawatra's admission that he used Video Link employees to bring large quantities of cash from Thailand to purchase equipment and pay operating expenses for the Enumclaw studio. Of the two transactions that plaintiffs cite, only one has anything to do with Washington. That is a description of the transport of $80,000 to help fund Video Link operations in Enumclaw. Arguably, this is a purposeful contact by Dr. Shinawatra. He directly sent money to fund the joint venture activities conducted in Washington.

Second, plaintiffs point to a bank account at an Enumclaw bank that Dr. Shinawatra opened "in connection with the agreements." Plaintiffs cite to portions of the record indicating that Dr. Shinawatra opened a checking account at the Enumclaw bank. The original purpose of this checking account appears to have been to allow Dr. Shina-

---

[25]See *Griffiths & Sprague*, 71 Wn.2d 679 (defendant ordered insurance from Washington broker); *Barer*, 20 Wn. App. 472 (defendant sought loan from Washington plaintiff); *Crown Controls, Inc. v. Smiley*, 47 Wn. App. 832, 737 P.2d 709 (1987) (defendant telephoned Washington company to form a contract), *aff'd*, 110 Wn.2d 695, 756 P.2d 717 (1988).

watra to cash a $10,000 check having nothing to do with the disputes in this litigation. But it also appears that Dr. Shinawatra later requested that payments made solely under the terms of the 1988 agreement among CTVC, SCC, Video Link, and TV Systems be deposited into this account. Dr. Shinawatra admitted receiving $80,000 through this account in connection with the 1988 agreement alone.

Plaintiffs' arguments in support of personal jurisdiction over defendants SCC and IBC rise or fall on the basis of personal jurisdiction over Dr. Shinawatra. He was the sole representative of these corporations with any arguable contacts with Washington. We have already discussed the substance of his contacts in our discussion of Dr. Shinawatra's activities relative to Washington and concluded that only two of the contacts arguably meet the first factor of the jurisdictional test. They are funding a portion of Video Link's operations in Enumclaw and use of an Enumclaw bank account. Thus, to the extent Dr. Shinawatra was acting as the agent for SCC or IBC in these two activities, there is potential personal jurisdiction over these corporate defendants in Washington.[26] Taking these facts in the light most favorable to plaintiffs, as we must, we assume Dr. Shinawatra was acting as an agent for the respective corporations when he funded a portion of Video Link's operations in Enumclaw and used the bank account to receive payments on the February 1988 agreement.

## 2. Tortious Conduct

Plaintiffs also assert that defendant purposely acted in Washington by committing tortious acts here.[27] We disagree.

To determine whether a tortious act occurred in Washington, the "last event necessary to make the defend-

[26]RCW 4.28.185 (agent can subject principal to long-arm jurisdiction).

[27]*See* RCW 4.28.185(1)(b).

ant liable" must have occurred in Washington.[28] Here, even when viewed as true, the allegations in the amended complaint and Plaintiff's More Definitive Statement do not establish that a tort occurred in Washington. Indeed, plaintiffs concede that Dr. Shinawatra's alleged tortious activities occurred primarily in Thailand.

Four of plaintiffs' ten claims sound in tort. The conversion claim involves events that occurred in Thailand: the alleged conversion of the license granted by Thai authorities and the activities of the Thai police. The claims of fraud and negligent misrepresentation likewise involve the issuance of the license, which occurred in Thailand. Finally, the allegations relevant to the claim of intentional interference with a business relationship do not involve conduct occurring in Washington. They relate to plaintiffs' meeting with CNN and defendants' activities in California with a supplier of technical services. The alleged torts were therefore not committed within this state, and no personal jurisdiction arises under this prong of the statute. We end the jurisdictional inquiry as to the tort claims here.[29]

Thus, Dr. Shinawatra's only purposeful contacts and those of SCC or IBC were through the Enumclaw bank account and the transport of cash to fund the Enumclaw operation of Video Link. We next address the second factor in the jurisdictional analysis to determine whether these contacts gave rise to plaintiffs' claims.

B.

Claims Arising Out of Purposeful Contacts

Plaintiffs alleged the following claims: (1) breach of contract (Video Link agreement); (2) breach of contract (purchase of Video Link); (3) breach of contract (equip-

---

[28] *MBM Fisheries*, 60 Wn. App. at 425.

[29] *MBM Fisheries*, 60 Wn. App. at 425.

ment purchase); (4) conversion; (5) common law fraud; (6) negligent misrepresentation; (7) intentional interference with business or economic relations; (8) equitable claims of breach of fiduciary duty, quasi-contract, unjust enrichment, quantum meruit, and quantum valebant; (9) breach of suretyship contract; and (10) breach of oral contracts.

To determine whether a claim against a foreign entity arises from its solicitation of business within this jurisdiction, Washington courts apply the "but for" test. Jurisdiction is proper in Washington if the events giving rise to the claim would not have occurred "but for" the corporation's solicitation of business within this state.[30]

First, plaintiffs fail to demonstrate that Dr. Shinawatra's cash disbursements to the Enumclaw operation gave rise to any of their causes of action. If anything, these disbursements indicated that defendants SCC and IBC were fulfilling their monetary obligations under the 1985 and 1987 agreements. Alternatively, Dr. Shinawatra, who signed the 1985 agreement only as a guarantor of TV System's management fee, volunteered to personally fund Video Link's Enumclaw operation.

Second, plaintiffs fail to show that Dr. Shinawatra's use of the Enumclaw bank account gave rise to any of their causes of action. The only cause of action to which the bank account arguably gives rise is the claim for breach of the February 1988 agreement. It is undisputed that the account was used by Dr. Shinawatra to receive payments for the purchase of equipment in Thailand under the terms of that agreement alone. But plaintiffs leave unexplained how Dr. Shinawatra's receipt of payments, either for himself or for SCC and IBC, gave rise to any of the causes of action.

In sum, plaintiffs have identified only two purposeful contacts that potentially give rise to any of their claims. They have failed to show *how* any of the contacts give rise

---

[30]*Shute*, 113 Wn.2d at 772.

to their claims. They have therefore failed in their burden to satisfy the second factor of the jurisdictional test.

Even if plaintiffs had made the proper showing for the first two factors of the jurisdictional test, we would nevertheless conclude that the third factor is not present. That factor requires that exercising jurisdiction in Washington over the claims relating to the 1988 agreement comports with fair play and substantial justice.

## C.
### Fair Play and Substantial Justice

■ The final factor to consider in the long-arm jurisdiction analysis is whether the assumption of jurisdiction offends traditional notions of fair play and substantial justice. In making this determination, courts consider the quality, nature, and extent of the defendant's activity in Washington, the relative convenience of the plaintiff and the defendant in maintaining the action here, the benefits and protection of Washington's laws afforded the parties, and the basic equities of the situation.[31] Plaintiffs have the burden to establish this third factor as well as the other two factors.

We have already discussed the quality, nature, and extent of Dr. Shinawatra's contacts in Washington and concluded they were minimal. His only contacts were sending cash to help fund the Video Link Enumclaw operation and the use of the Enumclaw bank account to receive payments under the February 1988 agreement. The same analysis and conclusions apply to SCC and IBC because their only contact with Washington for these purposes was through Dr. Shinawatra. Because these contacts were minimal, this consideration weighs against exercising jurisdiction over these defendants in Washington.

The next consideration is to consider the relative convenience of the respective parties in maintaining the action

---

[31]*DiBernardo-Wallace v. Gullo*, 34 Wn. App. 362, 365-66, 661 P.2d 991 (1983).

in Washington. It is plain to see that the subject matter of the dispute involves events that took place in Thailand. This includes questions related to the issuance of the license by the Thai government and the sale of the equipment in Thailand that is the subject of the 1988 agreement. Presumably, documents and witnesses that are discoverable are located in Thailand and Washington. We also note that Dr. Shinawatra and his wife are Thai nationals who reside in Thailand. SCC and IBC are Thai corporations. But Clearview has maintained offices and done business in Thailand since the mid-1980s. It also appears from the record that Clearview prevailed in the Thai courts against Dr. Shinawatra in a matter tangentially related to the disputes in this litigation. On balance, we conclude that the relative convenience of the respective parties to maintain the action in Washington favors plaintiffs at some detriment to defendants. The relative convenience would, of course, be reversed if the matter were tried in Thailand.

Plaintiffs have failed to show that Washington's laws afford the parties any special benefits or protections. We therefore do not consider this factor.

Finally, the basic equities of the situation dictate that Washington should not exercise jurisdiction. The disputes arising from the agreements among the corporate parties involve business conducted primarily in Thailand. Clearview went to Thailand with the idea of establishing the business there that is at issue in this litigation, and invited Dr. Shinawatra and his corporations to participate. We cannot think of any reason, on these facts, why Washington courts should exercise jurisdiction over any of the defendants based on the limited contacts shown here.

To summarize, we hold that plaintiffs have failed to meet their burden to show that defendants made the required minimum contacts in Washington, with two exceptions: the funding of Video Link's Enumclaw opera-

tions and the use of the Enumclaw bank account to receive payments for the sale of equipment in Thailand. Neither of these two contacts gave rise to any of plaintiffs' claims. To the extent that plaintiffs could make a showing that the contacts gave rise to their claims, the exercise of jurisdiction would offend traditional notions of fair play and substantial justice.

## III

### Attorney Fees

■ The trial court did not err by awarding attorney fees to defendants. The trial court may award reasonable attorney fees to a foreign defendant who prevails in an action on the basis that the court lacked personal jurisdiction under the long-arm statute.[32] We review the trial court's award of attorney fees to determine whether the court abused its discretion in establishing the reasonableness of fees.[33]

Plaintiffs do not challenge the reasonableness of the trial court's award of attorney fees. They simply argue that the court's fee award must be reversed because it was "based on the erroneous conclusion that [the trial] court could not exercise long-arm jurisdiction over plaintiffs' claims." But as we concluded above, the trial court correctly dismissed plaintiffs' claims for lack of personal jurisdiction. The court's fee award was proper.

■ Because we conclude that the trial court properly ordered dismissal of all defendants, we need not reach the remaining issues of whether service of process was proper and whether the doctrine of forum non conveniens applies in this case. In any event, defendants did not cross-appeal these claimed errors and first raised these issues as assignments of error in their response brief.[34]

---

[32]RCW 4.28.185(5).

[33]*Scott Fetzer Co. v. Weeks*, 122 Wn.2d 141, 149, 859 P.2d 1210 (1993).

[34]*See* RAP 5.1(d), 5.2(f).

We affirm the orders granting summary judgment of dismissal of the defendants and assessing fees in favor of the defendants against the plaintiffs.

AGID and ELLINGTON, JJ., concur.

Review denied at 131 Wn.2d 1020 (1997).