NATIONAL OCCUPATIONAL HEALTH SERVICES, INC., an Oklahoma corporation, Plaintiff,

v.

ADVANCED INDUSTRIAL CARE, a California corporation; Sherry J. Von Stess, Defendants.

No. 97–CV–1127–H.

United States District Court, N.D. Oklahoma.

Oct. 26, 1998.

1112

James Andrew Enlow, Schuller & Mills, Tulsa, OK, John Wayne Anderson, Jr, Tulsa, OK, Ike Amos Hobaugh, Ike Hobaugh Inc., Sand Springs, OK, for plaintiff.

Richard D. Koljack, Jr., Gable & Gotwals, Tulsa, OK, Sean A. Cottle, Andersen & Bonnifield, Concord, CA, for defendants.

### *ORDER*

HOLMES, District Judge.

This matter comes before the Court on a motion to dismiss (Docket # 2) by Defendants Advanced Industrial Care ("AIC") and Sherry J. Von Stieff. In its Complaint, Plaintiff National Occupational Health Services, Inc. ("NOHS") alleges that Defendant tortiously interfered with the contractual relationship between NOHS and Mobilization Optimization Stabilization and Training ("MOST"). In the instant motion, Defendants request that this action be dismissed for, *inter alia,* lack of personal jurisdiction and improper venue.

## I

For purposes of the present motion, the Court accepts as true the following uncontroverted statements of fact by NOHS:

1. In 1994, NOHS contracted with MOST to provide health screening, testing, and other services for MOST on a nationwide basis ("the Contract"). MOST is a trust established by the National Association of Construction Boilermaker Employees and the International Brotherhood of Boilermakers.

2. Under the Contract, NOHS had the following duties:

* Establishing a network of physicians or clinics to complete physical examinations of MOST members;

* Creating, assembling, and supplying documents, forms, and lab testing kits for use by the network physicians;

* Obtaining favorable pricing for the services of the network physicians;

* Gathering information from mobile testing, network physicians and clinics, and analyzing and compiling that information in a format useful to MOST; and

* Maintaining accurate and easily accessible records of all equipment calibration, testing, test data, and employee certifications.

All of NOHS' duties either were performed, or originated, in Tulsa, Oklahoma. MOST's duties under the Contract were simply to pay for services provided by NOHS as invoiced, and to provide background support as necessary on individual members.

3. In order to be able to perform under the Contract, NOHS created a unique and proprietary system for gathering, transmitting, processing, storing, and compiling the information required by MOST relating to its individual Boilermaker members. The system includes proprietary computer programs, forms, manuals, and procedures, all of which were created by NOHS in Tulsa, Oklahoma.

4. The procedure for testing MOST's individual members under the Contract worked as follows: NOHS would prepare prepackaged "kits" for MOST to send to its constituents for use in their individual testing. Each kit was assembled in Tulsa, and consisted of the requisite forms and paperwork (created by NOHS), lab materials, including plastic vials for the capture and transport of blood and urine specimens, x-ray forms, OSHA-required respirators to be custom-fitted to the individual, and a collection of pre-addressed and prepaid Federal Express envelopes and containers for transmission of the data and samples to NOHS in Tulsa for analysis and compilation.

5. When a member Boilermaker called MOST in Kansas City, MOST would send the kit to the member for testing. The member would then be tested by NOHS personnel when the remote testing facility was in the member's area.

6. NOHS initially provided its remote screening and testing services to MOST through the use of two (2) mobile testing

buses. These buses were headquartered in Tulsa, Oklahoma. Each of the buses was staffed by NOHS personnel, all of whom were residents of Tulsa. These personnel would travel in two-to-four week shifts to remote sites around the country to perform the tests and gather the data and physical samples required by MOST from its members.

7. Upon completion of the initial mobile screening, the member was sent to an NOHS contracted clinic to complete the physical portion of his testing. The contracted clinic returned the results of the member's physical tests to NOHS in Tulsa for analysis and input into NOHS' computer program. Upon completing all testing, the member would be eligible to work any Boilermaker job for the next year without further testing or paperwork.

8. Blood and urine samples were sent for testing from the remote site to a laboratory in St. Louis, Missouri. When the test results were completed, the laboratory completed an NOHS form and returned the information to NOHS in Tulsa for analysis and input into NOHS' computer program.

9. X-rays were sent from the remote site directly to NOHS in Tulsa. NOHS then forwarded the x-rays, along with an NOHS "diagnostic overread results" form, to Diagnostic Imaging in Tulsa for analysis. Upon completing the x-ray overread, the x-rays and completed forms were then returned to NOHS in Tulsa for analysis and input into NOHS' computer program.

10. Other data gathered at the remote site, including blood pressure, heart rate, respiratory results, and the member's health history, was immediately transmitted to NOHS in Tulsa for processing, analysis, and input into NOHS' computer program.

11. When NOHS had received all of the information gathered concerning an individual MOST member, that information was compiled, using NOHS' computer program, into a 4–5 page report on the member for use by MOST. NOHS also generated a report on computer floppy disk which contained the member's test results in OSHA-specified format. The report and disk were then sent from Tulsa to MOST in Kansas City, along with an invoice for NOHS' services.

12. In 1996, MOST expanded the services to be performed by NOHS under the Contract to include pre-apprenticeship fixed site testing of its members. In January of 1997, MOST authorized NOHS to assume the operation and management of its drug screening program. Shortly thereafter, MOST elected to discontinue the use of mobile site testing, and instead directed NOHS to secure fixed sites around the country at which the required tests could be performed. NOHS had to lay off between 10 and 12 Tulsa employees when the mobile testing program was discontinued.

13. The procedure with the fixed site facilities is identical to that used by the mobile facilities. Urine and blood are sent to St. Louis for analysis, with the results returned to NOHS in Tulsa for analysis and input into NOHS' computer program. X-rays are returned to NOHS in Tulsa for analysis and overread by Diagnostic Imaging, with the results returned to NOHS for analysis and input into NOHS' computer program. All other patient information is returned to NOHS in Tulsa for analysis and input into NOHS' computer program.

14. NOHS compiled and distributed a "training and operating kit" for each fixed site facility under the Contract. Included in the kit was the MOST Medical Manual created by NOHS, including instructions and proprietary forms for conducting the requisite MOST and OSHA testing, a copyrighted Fit Training Tape licensed exclusively to NOHS by the 3M Company, a Boilermaker video entitled "Expect the Unexpected," a 3M Fit Testing Kit, an assortment of 3M–6000 masks for customization to the individual member, and sample lab kits with extra collection tubes and bottles.

15. NOHS subcontracted with AIC to perform physicals for NOHS in California.

AIC began performing these screening physicals in 1996. During that year, AIC screened seventy-five (75) Boilermakers for NOHS. In accordance with the MOST procedures, AIC returned screening information on each of the 75 Boilermakers to NOHS in Tulsa.

16. In early 1997, NOHS expanded AIC's responsibilities under its subcontract to include comprehensive fixed site testing. A training and operating kit was provided to AIC in order to enable AIC to perform these additional responsibilities in accordance with MOST requirements. AIC performed 11 pre-apprenticeship and approximately fifty (50) comprehensive screenings during 1997 and early 1998 for NOHS. For each of the approximately sixty (60) Boilermakers tested, AIC sent x-rays to NOHS in Tulsa for analysis and overread, physical information to NOHS in Tulsa for analysis and input into NOHS' computer program, and specimens to St. Louis for analysis and return to NOHS in Tulsa for analysis and input into NOHS' computer program. AIC also sent an invoice to NOHS for the testing performed on each Boilermaker.

17. AIC's relationship with NOHS lasted the better part of two years, involved AIC's screening or testing of over 125 Boilermaker members, caused the exchange of hundreds of documents and correspondence via Federal Express and the United States Postal Service, and resulted in the payment of thousands of dollars to AIC by NOHS.

The Court further accepts as true the following uncontroverted statements of fact by Defendants:

1. AIC is a California corporation with its principal place of business in Concord, California. AIC is a business that conducts health screening services for industrial contractors and various other entities. The health screening process consists of conducting physical examinations of current and prospective employees. The physical examination can include any combination of the following: obtaining a health history of the worker, a complete physical examination, drug screening, respirator certification, and other lab work.

2. On or about December 1, 1997, NOHS sent AIC a fax requesting that AIC perform medical screening of various members of the Boilermakers Union in the San Francisco Bay Area. AIC did not solicit work from NOHS, and no negotiations concerning AIC's work occurred in Oklahoma. AIC performed the requested work in California.

3. AIC sent invoices to NOHS in Tulsa, Oklahoma for work performed by AIC in California. NOHS periodically paid AIC's invoices by sending checks to AIC in Concord, California. AIC deposited those checks in its bank account at West America Bank in Concord, California.

4. AIC has never been licensed to do business in Oklahoma, nor has it ever done business in Oklahoma. AIC has never been domesticated under Oklahoma laws, nor has it ever had an agent for service of process in Oklahoma.

5. AIC has never maintained an office, telephone listing, or mailing address in Oklahoma, and has never owned or leased any real or personal property in Oklahoma. AIC has never assigned or stationed any employee to work for it in Oklahoma.

6. AIC has never paid any Oklahoma taxes, has never had an Oklahoma shareholder, has never held any corporate meetings in Oklahoma, has never maintained any business records in Oklahoma, and has never maintained any bank account in Oklahoma.

7. Any dealings or contacts Ms. Von Stieff may have had with NOHS was in her capacity as Chief Executive Officer of AIC.

8. Any dealings or contacts Ms. Von Stieff may have had with MOST was in her capacity as Chief Executive Officer of AIC.

9. In her individual capacity, Ms. Von Stieff has never conducted business in Oklahoma, never had employees or agents

in Oklahoma, never owned any real or personal property located in Oklahoma, and never maintained any records in Oklahoma. Ms. Von Stieff never sold products in Oklahoma and has never provided services to persons in Oklahoma. She has never solicited business in Oklahoma.

10. Ms. Von Stieff has never paid any Oklahoma taxes, has never maintained any bank account in Oklahoma, and never maintained an office, telephone listing, or mailing address in Oklahoma.

## II

■ In the first instance, Defendants argue that this matter should be dismissed for lack of personal jurisdiction. It is well-established law that jurisdiction must be found over the person before the issue of venue may be addressed. *See Bookout v. Beck,* 354 F.2d 823 (9th Cir.1965). In Oklahoma [1]:

> [t]he plaintiff bears the burden of establishing personal jurisdiction over the defendant. Prior to trial, however, when a motion to dismiss for lack of jurisdiction is decided on the basis of affidavits and other written materials, the plaintiff need only make a prima facie showing. The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits. If the parties present conflicting affidavits, all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party.

*Rambo v. American Southern Ins. Co.,* 839 F.2d 1415, 1417 (10th Cir.1988) (citations omitted). Thus, the Court must "determine whether the plaintiff's allegations, as supported by affidavits, make a prima facie showing of the minimum contacts necessary to establish jurisdiction over each defendant." *Id.*

■ "The test for exercising long-arm jurisdiction in Oklahoma is to determine first whether the exercise of jurisdiction is authorized by statute and, if so, whether such exercise of jurisdiction is consistent with the constitutional requirements of due process. In Oklahoma, this two-part inquiry collapses into a single due process analysis, as the current Oklahoma long-arm statute provides that '[a] court of this state may exercise jurisdiction on any basis consistent with the Constitution of this state and the Constitution of the United States.'" *Id.* at 1416 (citations omitted).

■ The *Rambo* court stated that:

> [j]urisdiction over corporations may be either general or specific. Jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum state is "specific jurisdiction." In contrast, when the suit does not arise from or relate to the defendant's contacts with the forum and jurisdiction is based on the defendant's presence or accumulated contacts with the forum, the court exercises "general jurisdiction."

839 F.2d at 1418 (citations omitted); *see Doe v. Nat'l Med. Servs.,* 974 F.2d 143, 145 (10th Cir.1992) ("Specific jurisdiction may be asserted if the defendant has 'purposefully directed' its activities toward the forum state, and if the lawsuit is based upon injuries which 'arise out of' or 'relate to' the defendant's contacts with the state."). The Supreme Court has explained that:

> [j]urisdiction in these circumstances may not be avoided merely because the defendant did not physically enter the foreign state ... it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communication across state lines, thus obviating the need for physical presence within a state in which business is conducted. So long as a commercial actor's efforts are "pur-

---

**1.** The Court applies the law of the forum state, in this case, Oklahoma, to determine whether it has jurisdiction over a nonresident defendant in a lawsuit based on diversity of citizenship. *See Federated Rural Elec. Ins. Corp. v. Kootenai Elec. Co-op.,* 17 F.3d 1302, 1304 (10th Cir.1994); *see also* Fed.R.Civ.P. 4(e).

posefully directed" toward residents of another state, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

■ Three criteria guide the Court's determination of whether personal jurisdiction exists: (1) in relation to the plaintiff's claim, the defendants must have purposefully availed themselves of the privilege of conducting activities in Oklahoma, *see Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); (2) for specific jurisdiction, the cause of action must arise from the defendants' activities in Oklahoma; and (3) the acts or the consequences of the acts of the defendants must have a substantial enough connection with Oklahoma to make the exercise of jurisdiction reasonable, *see LAK, Inc. v. Deer Creek Enters.,* 885 F.2d 1293, 1299 (6th Cir.1989), *cert. denied,* 494 U.S. 1056, 110 S.Ct. 1525, 108 L.Ed.2d 764 (1990).

### III

■ In the instant case, the Court finds that personal jurisdiction exists in Oklahoma over Defendants. Plaintiff alleges in its Complaint a cause of action for tortious interference with NOHS' Contract with MOST. Under Oklahoma law, the elements of this cause of action are 1) that plaintiff had a business or contractual right that was interfered with; 2) that the interference was malicious and wrongful, and that such interference was neither a justified privilege nor excusable; 3) that damage was proximately sustained as a result of the complained-of interference. *See Mac Adjustment, Inc. v. Property Loss Research Bureau,* 595 P.2d 427, 428 (Okla. 1979); *see also Ellison v. An–Son Corp.,* 751 P.2d 1102, 1106 (Okla.Ct.App.1987), *cert. denied* (Okla.1988).

Based on the record, the Court finds that Oklahoma has an interest in the Contract between NOHS and MOST. Plaintiff's principal place of business was in Oklahoma, tests were either performed in Oklahoma or tests results were transmitted to MOST through Oklahoma, and invoices for services performed by Plaintiff were sent from Oklahoma. Accordingly, venue for an action arising under the Contract, which this is not, would be proper in Oklahoma. *See generally F.A.I. Electronics Corp. v. Chambers,* 944 F.Supp. 77 (D.Mass.1996). Furthermore, the Contract represented an Oklahoma property right. *See Overbeck v. Quaker Life Ins. Co.,* 757 P.2d 846, 847 (Okla.Ct.App.1984) (comparing tort of interference with prospective economic advantage with tort of interference with contract stating "interference with a prospective economic advantage usually involves interference with some type of reasonable expectation of profit, whereas interference with a contractual relationship results in loss of a property right."). Therefore, the Court concludes that the Contract is an Oklahoma contract.

Of course, as noted above, this action is not for breach of the Contract, but rather sounds in tort for conduct that occurred outside of Oklahoma. Accordingly, the question becomes whether alleged tortious interference with contractual relations based on acts outside Oklahoma that interfered with an Oklahoma contract constituted contacts with the forum state such that personal jurisdiction is proper here. The Court concludes that such acts are a sufficient basis for personal·jurisdiction under applicable law.

■ A party that tortiously interferes with the contract of another is subject to personal jurisdiction in the state in which the property rights under that contract exist.[2] Clearly, the alleged conduct

---

2. The Court finds that the cases cited by Defendants in opposition to personal jurisdiction in Oklahoma are inapposite. *See Hill v. Noble Drilling Corp.,* 61 Cal.App.3d 258, 132 Cal.Rptr. 154 (1976) (a California resident

brought an action in California for interference with a contract that was to be performed in specific states in the "Southwest Region," but which region did not include California); *Munchak Corp. v. Riko Enterprises, Inc.,* 368

of such an interfering party, while outside the forum state, is "purposefully directed" toward residents of the forum state. *Burger King,* 471 U.S. at 476, 105 S.Ct. 2174. It should be emphasized that personal jurisdiction here does not exist because injury occurred in Oklahoma. It is settled law that the mere foreseeability of causing injury in another state "is not a 'sufficient benchmark'" for exercising personal jurisdiction. *Id.* at 474, 105 S.Ct. 2174. Rather, "the foreseeability that is critical to due process analysis . . . that the defendant's conduct in connection with the forum state are such that he should reasonably anticipate being haled into court there." *Id.* (quoting *World–Wide Volkswagen v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). "[T]here [must] be some act by which the defendant purposely avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Id.* at 475, 105 S.Ct. 2174. The "purposeful availment" requirement insures that a defendant will not be haled into a jurisdiction as a result of another party's unilateral act. *Id.* The alleged malicious acts by Defendants outside Oklahoma were intended to cause injury within Oklahoma, because such acts were directed at an Oklahoma contract.[3] Thus, the alleged interference to Plaintiff's contractual relations in Oklahoma was not only foreseeable, but was in fact the deliberate consequence of Defendants' alleged conduct.[4]

Consistent with this view, the court in *Jobe v. ATR Marketing, Inc.,* 87 F.3d 751, 753 (5th Cir.1996), stated:

> A tort is complete when, and personal jurisdiction lies where, the actual injury occurs. In determining where the injury occurred for jurisdictional purposes, actual injury must be distinguished from its result and consequences, such as pain and suffering, economic effects, or other collateral consequences that often stem from the actual injury. Recognizing that such collateral consequences may be far reaching (particularly in a commercial tort situation such as the one before us), our precedent holds that consequences stemming from the actual tort injury do not confer personal jurisdiction at the sight or sights where such consequences happen to occur.

*Jobe,* 87 F.3d at 753 (citations omitted).

Therefore, the Court finds that personal jurisdiction over the Defendants in Oklahoma is proper in this case.

## IV

 Personal jurisdiction, however, does not render venue proper in any state. To the contrary, venue is determined sole-

---

· F.Supp. 1366 (M.D.N.C.1973) (a North Carolina resident brought an action prior to *Burger King* for interference with a basketball player's contract in which the court was required to determine whether the contract was a "property right" or an "asset or thing of value" within the meaning of the North Carolina state statute); *Beckman v.. Thompson,* 4 Cal.App.4th 481, 6 Cal.Rptr.2d 60 (1992) (a California resident brought an action for interference with a contract to be performed in Tennessee); *CTVC of Hawaii, Co., Ltd. v. Shinawatra,* 82 Wash.App. 699, 919 P.2d 1243 (1996) (a Washington resident brought an action for interference with a contract that was to be performed in Bangkok, Thailand); *Goldberg v. Miller,* 874 F.Supp. 874 (N.D.Ill. 1995) (an Illinois resident brought an action for interference with a contract that the court, in the same opinion, expressly determined

"was not substantially connected with Illinois").

3. Defendants conceded at the hearing in this matter that a resident of Arkansas may be brought before an Oklahoma court without ever entering the forum state for committing · an act of assault from the Arkansas side of the state line. Similarly, the tortious acts present here were directed across the state line at an Oklahoma contract and the Oklahoma party to that contract.

4. *See Doe v. National Med. Servs.,* 974 F.2d 143, 145 (10th Cir.1992) (stating that "[s]pecific jurisdiction may be asserted if the defendant has 'purposefully directed' its activity toward the forum state, and if the lawsuit is based upon injuries which 'arise out of' or 'relate to' the defendant's contacts with the state.")

1119

ly by statute. In its entirety, 28 U.S.C. § 1391(a) provides as follows:

(a) A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, *if there is no district in which the action may otherwise be brought.*

*Id.* (Emphasis added).

In the instant case, it is undisputed that each of the Defendants is a resident of California. Therefore, under section 1391(a)(1), this action clearly may be brought in California and this action may not be brought in Oklahoma. Furthermore, accepting as true the allegations in the Complaint, the alleged tortious interference with the Contract resulted from acts outside Oklahoma. Thus, no "substantial part of the events or omissions giving rise to the claim occurred" in the forum state. Moreover, this action sounds in tort, and there is no property that is the "subject of this action" as that term is used in section 1391(a)(2).[5] *See* 28 U.S.C.A. § 1391(a)(2), commentary at 10 (West 1993). Since neither a substantial part of the events or omissions giving rise to the claim occurred in Oklahoma, nor a substantial part of the property that is subject to the action is situated in Oklahoma, this action may not be brought in Oklahoma under section 1391(a)(2).

Finally, section 1391(a)(3) expressly requires as a condition of its applicability that "... there is no district in which the

action may otherwise be brought." The commentaries make clear that this phrase is a condition precedent for venue under this clause. *See* 28 U.S.C.A. § 1391(a)(3), commentary at 11 (West 1993) ("[P]laintiff can turn to clause (3) only if there is no district that will satisfy as proper venue under clause (1) or clause (2)."). In the instant case, as discussed above, this action may be brought in California under section 1391(a)(1). Accordingly, this action cannot be brought in Oklahoma under section 1391(a)(3). Since there is no statutory basis for venue of this case in Oklahoma, and Defendant has timely objected to venue here, dismissal of this case is proper. *See Polizzi v. Cowles Magazines,* 345 U.S. 663, 73 S.Ct. 900, 97 L.Ed. 1331 (1953).

For the reasons set forth above, Defendant's motion to dismiss for lack of venue is hereby granted. As a result, the Court need not reach the other claims in Defendant's motion to dismiss.

IT IS SO ORDERED.

---

5. Plaintiff argues that the Oklahoma Contract at issue here, or perhaps the transmission of proprietary information pursuant to such contract, satisfies the "property" requirement of section 1391(a)(2). This argument must be rejected. The reference to property in this section specifically contemplates that the property is the subject of the action. *See* Plaintiff's Brief in Response to Motion to Dismiss at 7–8.