[No. 16804-5-I. Division One. May 28, 1987.]

CROWN CONTROLS, INC., *Respondent,* v. JIM SMILEY, *Appellant.*

*Jim Smiley,* pro se.

*Jeffrey C. Wishko* and *Lesourd & Patten,* for respondent.

CHAN, J.*—Jim Smiley appeals from a judgment rendered against him for $9,136.03 plus interest, stemming from

---

*This appeal was heard by a Supreme Court Justice, a Superior Court Judge, and a retired Superior Court Judge sitting as Court of Appeals Judges Pro Tempore in Division One.

the purchase of certain industrial equipment from Crown Controls, Inc. He contends the court erred: (1) in assuming personal jurisdiction over him; (2) in finding him liable as an agent of an undisclosed principal; (3) in failing to determine there had been an election of remedies; and (4) in awarding prejudgment interest. We affirm, but remand for entry of judgment against both the principal and agent.

Jim Smiley operates a manufacturer's representative/distributorship business from his home in Bend, Oregon. Smiley uses various trade names for his businesses, including "Industrial Associates," "Industrial Associates International," "Engineering Products Manufacturing Company," and "Consolidated Leasing." Smiley is also the president of North American Drill Supply, Inc. (NADS), an Oregon corporation. The trade name "Industrial Associates" is owned by NADS and was registered pursuant to Oregon law.

Crown Controls, Inc., is a Washington corporation. It is a manufacturer's representative for chemical controls equipment suppliers.

In June 1983, Smiley telephoned Crown Controls and spoke with its president, Michael Slomer. Smiley identified himself as an agent of Industrial Associates. After several telephone discussions regarding various items of equipment and their prices, Crown Controls agreed to supply and Industrial Associates agreed to purchase certain gas chlorination equipment. The equipment was duly delivered to and accepted by Industrial Associates' agent in Portland, Oregon, and it was then shipped to an Industrial Associates customer in Guam. Crown Controls invoiced Industrial Associates for these shipments in July and August 1983, for a total principal sum of $9,136.03.

At the time of this transaction, Industrial Associates, through Smiley, also purchased certain pump control valves from Crown Controls. The Roll Seal Valve Company, located in Irvine, California, supplied the valves to Crown Controls. Industrial Associates' customers were dissatisfied with these valves and returned them directly to Roll Seal Valve Company.

At no time did Smiley disclose to Crown Controls he was acting on behalf of a corporate entity in general, or NADS in particular. He only disclosed he was acting on behalf of "Industrial Associates." Crown Controls requested credit references from Smiley after some of the equipment had been ordered, and Smiley supplied two bank references. Crown Controls only investigated one of them, which was in the name of "Industrial Associates–International." The second bank account indicated the existence of NADS, Inc., on the monthly statements, but not on the printed checks. Mr. Slomer first knew of the existence of NADS, Inc., when his attorney sent him a copy of the complaint in this case.

Crown Controls was not paid and commenced this action in February 1984. In March 1984, NADS commenced litigation in Oregon against Crown Controls regarding the pump control valve problems. NADS also claimed the pump control valve problems constituted a partial setoff to the amount claimed in this action. In August 1984, Crown Controls obtained a partial summary judgment against NADS in this action for $5,547.92 plus prejudgment interest. There remained for trial the issues of Smiley's personal liability and the claimed setoff. In February 1985, NADS obtained judgment against Crown Controls for $3,363.11 in the Oregon action. That sum was the exact amount alleged as a setoff in this action.

After the partial summary judgment but before trial in this action, Crown Controls conducted a supplemental proceeding against Smiley as president of NADS. Crown Controls then attempted to garnish NADS' bank account, but the account was closed.

Trial of this action proceeded against Smiley in March 1985. The Superior Court found Smiley had failed to disclose the identity of his true principal. The court also ruled Smiley had sufficient contacts with Washington to justify imposition of personal jurisdiction under the long–arm statute, RCW 4.28.185. The court granted Crown Controls the option of taking judgment against Smiley and vacating the partial summary judgment against NADS. Crown Con-

trols selected that option and judgment was entered against Smiley for $9,136.03 plus pre– and post–judgment interest.[1] Smiley timely appeals.

Smiley first contends he did not have the minimum contacts with Washington necessary under the due process clause to justify personal jurisdiction under the long–arm statute. Crown Controls argues Smiley waived any minimum contacts argument by failing to raise it in a responsive pleading or written motion. *See* CR 12(h). The issue was thoroughly litigated by the parties at trial and we will address the issue.

Smiley argues "a single telephone call" is not sufficient to subject an Oregon resident to Washington jurisdiction. An unchallenged finding states Smiley initiated the transaction between the parties, and there were "several" telephone conversations before the parties agreed on a contract. This finding is a verity on appeal. *Davis v. Department of Labor & Indus.*, 94 Wn.2d 119, 615 P.2d 1279 (1980). It is also supported by substantial evidence, as the president of Crown Controls testified Smiley initially telephoned him and he spoke with Smiley approximately four times. In addition, one item was ordered by Crown Controls from a Washington company and shipped to Industrial Associates "F.O.B. Bellevue."

A Washington court may exercise personal jurisdiction if these criteria are met:

> (1) The nonresident defendant or foreign corporation must purposefully do some act or consummate some transaction in the forum state; (2) the cause of action must arise from, or be connected with, such act or transaction; and (3) the assumption of jurisdiction by the forum state must not offend traditional notions of fair play and substantial justice, consideration being given to the quality, nature and extent of the activity in the forum state, the relative convenience of the parties, the benefits and protection of the laws of the

---

[1]The court ruled the judgment would be for $9,136.03 if a satisfaction of the Oregon judgment were entered, otherwise the judgment in this action would be $5,547.92 plus interest.

forum state afforded the respective parties, and the basic equities of the situation.

*Sorb Oil Corp. v. Batalla Corp.*, 32 Wn. App. 296, 298–99, 647 P.2d 514 (1982), quoting *Lewis v. Curry College*, 89 Wn.2d 565, 568, 573 P.2d 1312 (1978).

■ *Griffiths & Sprague Stevedoring Co. v. Bayly, Martin & Fay, Inc.*, 71 Wn.2d 679, 430 P.2d 600 (1967) is directly on point. There, plaintiff was a Washington insurance broker and defendant was a California insurance broker. Defendant solicited plaintiff by telephone and mail to procure insurance for one of its customers; plaintiff obtained it from Lloyds of London. The customer failed to pay the premium, and plaintiff sued defendant in Washington to recover the amount. The court held it would not violate due process to impose personal jurisdiction:

> In the absence of a connecting tie or link between a nonresident and the forum state, the long–arm statute does not vest jurisdiction in the courts of a forum state where none existed before enactment of the statute. But the statute does tacitly recognize as an economic fact of modern life that large segments of commerce, finance, manufacturing and agriculture inevitably seek out a connection with or link to customers, consumers, users, fabricators, processors, or subcontractors in other states who intend or contemplate that the product, process or article of commerce, manufacturing or agriculture shall be consumed, used or employed in states other than the place of origin or beginning.
>
> The connecting link then may consist of affirmative acts taking place here by which the out–of–state resident overtly submits to jurisdiction; or the initiation of a transaction outside the state in contemplation that some phase of it will take place in the forum state; or the start of a commercial process outside the forum state on the assumption that the article will be sold, used or acted upon or within many other states but with no particular jurisdiction in actual contemplation. The existence of these phenomena of modern economy are ordinarily enough to bring the parties within the long–arm statute without engendering an unjust or oppressive extension of jurisdiction.

. . .

When defendant, Bayly, Martin & Fay, insurance brokers in Los Angeles, ordered insurance by telephone and mail from or through plaintiff, Farwest General Agency, insurance brokers in Seattle, Washington, it overtly performed acts making it a party to and participant in a business transaction in Washington even though it was contemplated by Bayly, Martin & Fay that the insurer might be a foreign agency. Defendant thus submitted to the jurisdiction of Washington courts under the long–arm statute as to that particular transaction.

*Griffiths & Sprague Stevedoring Co. v. Bayly, Martin & Fay, Inc., supra* at 684–85.

In *Peter Pan Seafoods, Inc. v. Mogelberg Foods, Inc.,* 14 Wn. App. 527, 544 P.2d 30 (1975), defendant was a New Jersey corporation which initiated a business relationship with plaintiff Washington corporation. This court held defendant's conduct in soliciting a series of sales, traveling to Washington to inspect plaintiff's facilities, and the fact most of the goods were delivered "F.O.B. Seattle," provided the minimum contacts necessary to justify imposition of personal jurisdiction. The court particularly relied upon the fact the defendant initiated the contacts. *Peter Pan Seafoods, Inc.,* at 532. The court further held the trial court on remand would have discretion to dismiss on forum non conveniens grounds if the requisite circumstances were shown.

This court followed *Griffiths* and *Peter Pan Seafoods* in *Sorb Oil Corp. v. Batalla Corp., supra.* There, the defendant was a Texas corporation which had ordered products from a Washington distributor. The products were ordered at irregular intervals and in varying quantities over approximately 18 months. The products were shipped directly from the manufacturer in Indiana to defendant. The court recognized the amount of business was less than that in *Peter Pan Seafoods,* and that defendant did not initiate the transactions. The court nevertheless held defendant had the protection of Washington laws and thus it would not violate due process to impose jurisdiction.

*Accord, Cofinco of Seattle, Ltd. v. Weiss,* 25 Wn. App. 195, 605 P.2d 794 (1980) (defendant purposefully entered into employment contract with Washington corporation, thereby invoking protection of Washington laws; personal jurisdiction upheld); *Huebner v. Sales Promotion, Inc.,* 38 Wn. App. 66, 684 P.2d 752 (1984), *review denied,* 103 Wn.2d 1018 (Texas defendants solicited business in Washington through magazine advertisements and personal contacts; personal jurisdiction upheld because, *inter alia,* defendants could reasonably foresee being haled into Washington court for harm flowing from their activities), *cert. denied,* 474 U.S. 818, 88 L. Ed. 2d 52, 106 S. Ct. 64 (1985).

Based upon the foregoing analysis, we hold it did not offend traditional notions of fair play and substantial justice to impose personal jurisdiction here. Smiley initiated the contacts and had the protection of Washington courts. We also note there is nothing in the record to indicate Smiley moved to dismiss on forum non conveniens grounds, even though NADS, Inc., commenced suit in Oregon against Crown Controls while this action was pending. *See Peter Pan Seafoods, Inc. v. Mogelberg Foods, Inc., supra.*

Smiley also argued in his brief that Crown Controls failed to file an affidavit of service as required by RCW 4.28.185(4). His counsel conceded at oral argument the affidavit was timely filed. We consider the issue to be moot.

Smiley next contends the court erred in finding he failed to sufficiently disclose his principal.

Whether an agent has disclosed the identity of his principal so as to avoid personal liability is a question of fact. *Matsko v. Dally,* 49 Wn.2d 370, 301 P.2d 1074 (1956). *Accord, Maxwell's Elec., Inc. v. Hegeman–Harris Co.,* 18 Wn. App. 358, 567 P.2d 1149 (1977). Therefore this court will uphold the trial court decision if it is based upon substantial evidence. *Ridgeview Properties v. Starbuck,* 96 Wn.2d 716, 638 P.2d 1231 (1982).

The parties do not cite any Washington authority, and our research has revealed none, addressing whether disclosure of a trade name is sufficient disclosure of a prin-

cipal. However, courts in other jurisdictions have held the agent has the duty to disclose the true name of the principal, not just the principal's assumed name; the plaintiff does not have a duty to inquire; and the burden of proving disclosure is upon the agent. *Myers–Leiber Sign Co. v. Weirich*, 2 Ariz. App. 534, 410 P.2d 491 (1966); *Brown–Wright Hotel Supply Corp. v. Bagen*, 112 Ga. App. 300, 145 S.E.2d 294 (1965); *Judith Garden, Inc. v. Mapel*, 342 N.Y.S.2d 486 (Cir. Ct. 1973); 3 Am. Jur. 2d *Agency* § 327 (1986).

Smiley argues Industrial Associates' true identity could have been revealed had Crown Controls followed up on the credit information he supplied. First, this information was supplied after some of the equipment had already been ordered. Disclosure must take place at the time of contracting. *Matsko v. Dally, supra.* Second, the monthly bank statement sent to Smiley, but not the printed checks, disclose the true situation. No evidence was produced from the bank indicating what it would have revealed in response to a credit inquiry.

Smiley relies upon *Seattle Ass'n of Credit Men v. Green*, 45 Wn.2d 139, 273 P.2d 513 (1954), which held plaintiffs had a duty to check assumed name filings.[2] There, creditors of an insolvent corporation argued it had abandoned its corporate status by adopting an assumed name, and therefore its officers and directors were liable as partners by estoppel. The court held the term "Company" in the assumed name put the creditors at least on inquiry notice, as "Company" could denote either a partnership or a corporation. The court emphasized there was nothing deceptive or misleading about the assumed name.

*Seattle Ass'n of Credit Men* is distinguishable from the instant case. "Industrial Associates" connotes a partnership

---

[2]It is undisputed NADS, Inc., was an Oregon corporation. The parties and the trial court assumed the Oregon trade name statute is the same as Washington's. *See Save–Way Drug, Inc. v. Standard Inv. Co.*, 5 Wn. App. 726, 490 P.2d 1342 (1971).

only. *See* Black's Law Dictionary (5th ed. 1979). The assumed name is misleading and would not put a creditor on inquiry notice. Furthermore, it has been repeatedly held the only consequence of filing an assumed name is the ability to sue in Washington courts. *E.g., Griffiths & Sprague Stevedoring Co. v. Bayly, Martin & Fay, Inc., supra; McCombs Constr., Inc. v. Barnes,* 32 Wn. App. 70, 77 n.2, 645 P.2d 1131 (1982); *Laliberte v. Wilkins,* 30 Wn. App. 782, 638 P.2d 596 (1981).

As the court noted in *Judith Garden, Inc. v. Mapel, supra,* it is not unreasonable to place upon the agent the burden to fully disclose his principal's identity. This would seem to be especially true where, as here, an interstate transaction is involved. It would have been a simple matter for Smiley to disclose the existence of "NADS, Inc. dba Industrial Associates", whereas it would be unreasonable to impose upon Crown Controls the duty to inquire of the appropriate Oregon state official whether there was an assumed name filing for Industrial Associates.

█ Smiley also assigns error to finding of fact 2.8 regarding a conditional tender he made to Crown Controls in response to a demand for payment. Whether the word "my" in the conditional tender meant Smiley or NADS, Inc., was immaterial to the court's decision that Smiley was an agent of an undisclosed principal. The court correctly relied upon the facts existing at the time of contracting. Any error in a finding that was not material to the court's decision is deemed harmless. *Ulberg v. Seattle Bonded, Inc.,* 28 Wn. App. 762, 626 P.2d 522 (1981); *Prager's, Inc. v. Bullitt Co.,* 1 Wn. App. 575, 463 P.2d 217 (1969).

We hold substantial evidence supports the trial court's conclusion Smiley is personally liable as an agent of an undisclosed principal.

Smiley next contends Crown Controls' efforts to collect its partial summary judgment against NADS constituted an election of remedies. Smiley relies upon *Pennsylvania Cas. Co. v. Washington Portland Cement Co.,* 63 Wash. 689, 116 P. 284 (1911). We agree that Crown Controls' acts of con-

ducting a supplemental proceeding and garnishing NADS' bank account constituted an election by Crown Controls to hold NADS liable to the exclusion of Smiley. However, we believe the election rule pertaining to agents and undisclosed principals is illogical and contrary to the policy favoring full compensation of wronged parties. We therefore hold, for the reasons that follow, that Crown Controls may have judgment against both NADS and Smiley, although it may only have one satisfaction.

In dicta, *Pennsylvania Cas. Co. v. Washington Portland Cement Co.* recites the common law rule that, upon learning all the facts, a creditor who elects to hold the previously undisclosed principal liable thereby discharges the agent. The agent is discharged from liability even if the creditor thereafter discovers the principal is insolvent. *Chapman v. Ross,* 152 Wash. 262, 277 P. 854 (1929). Many Washington cases repeat this rule, mostly in dicta, and none discusses the rationale behind the rule. *E.g., Glover v. Tacoma Gen. Hosp.,* 98 Wn.2d 708, 658 P.2d 1230 (1983) (terming the case law in this area "sketchy"); *Turnbull v. Shelton,* 47 Wn.2d 70, 286 P.2d 676 (1955); *Patent Scaffolding Co. v. Roosevelt Apartments, Inc.,* 171 Wash. 507, 18 P.2d 857 (1933); *LeVette v. Hardman Estate,* 77 Wash. 320, 137 P. 454 (1914); *McDonald v. New World Life Ins. Co.,* 76 Wash. 488, 136 P. 702 (1913); *Landers v. Foster,* 34 Wash. 674, 76 P. 274 (1904); *Roderick Timber Co. v. Willapa Harbor Cedar Prods., Inc.,* 29 Wn. App. 311, 627 P.2d 1352 (1981); *Maxwell's Elec., Inc. v. Hegeman–Harris Co., supra.*

 This court may abandon or modify a common law rule if, in the light of current conditions and thinking, the rule's precepts are incompatible with present–day society.[3]

---

[3] "The life of the law has not been logic: it has been experience. The felt necessities of the time, the prevalent moral and political theories, intuitions of public policy, avowed or unconscious, even the prejudices which judges share with their fellow–men, have had a good deal more to do than the syllogism in determining the rules by which men should be governed. The law embodies the story of a nation's development through many centuries, and it cannot be dealt with as if it contained only the axioms and corollaries of a book of mathematics. In order to

*Irwin v. Coluccio,* 32 Wn. App. 510, 648 P.2d 458, *review denied,* 98 Wn.2d 1011 (1982); *Wyman v. Wallace,* 15 Wn. App. 395, 549 P.2d 71 (1976), *aff'd,* 94 Wn.2d 99, 615 P.2d 452 (1980).

A leading case abolishing the rule of alternative liability in the undisclosed principal context is *Grinder v. Bryans Rd. Bldg. & Supply Co.,* 290 Md. 687, 432 A.2d 453 (1981). As in this case, the creditor there obtained a summary judgment against the undisclosed principal and then proceeded to a trial against the agent. The trial court held that the mere taking of a summary judgment against the principal did not estop plaintiff from obtaining judgment against the agent. The Court of Special Appeals (Maryland's intermediate appellate court) remanded to permit plaintiff to make an election, holding the taking of a nonfinal summary judgment did not preclude a later election. The Court of Appeals (Maryland's highest state court) agreed no final election had been made because the agent had not demanded it by motion or other appropriate pleading. *Grinder,* at 691 n.3. Nevertheless, the court took the opportunity to review and abolish the election rule.

The court in *Grinder* first reviewed the three reasons commonly given for the election rule: (1) One contract–no windfall. This reason is based upon the notion it would be unjust to permit the creditor to pursue two causes of action when it made only one contract. (2) Avoidance of vexatious double litigation. The court stated the need to avoid double litigation through the election rule is greatly undercut by modern pleading and practice, which permits an agent who is sued to implead the principal or to cross–claim for

---

know what it is, we must know what it has been, and what it tends to become. We must alternately consult history and existing theories of legislation. But the most difficult labor will be to understand the combination of the two into new products at every stage. The substance of the law at any given time pretty nearly corresponds, so far as it goes, with what is then understood to be convenient; but its form and machinery, and the degree to which it is able to work out desired results, depend very much upon its past.'" *Wyman v. Wallace,* 15 Wn. App. 395, 396 n.1, 549 P.2d 71 (1976), *aff'd,* 94 Wn.2d 99, 615 P.2d 452 (1980), quoting O. Holmes, *The Common Law* 1–2 (1881).

indemnity against the principal if they are sued jointly. *See, e.g.,* CR 13, 14, 18, 20. *See also Pennsylvania Cas. Co. v. Washington Portland Cement Co., supra* (addressing contention regarding misjoinder of parties defendant, which is no longer an issue under the liberal joinder provisions of CR 20(a)). (3) Merger. The court discounted traditional merger analysis as inconsistent with the rule that a principal is not discharged if the creditor recovers judgment against the agent before learning the identity of the principal.

The *Grinder* court adopted the law of Pennsylvania as the better reasoned rule and the one endorsed by legal commentators. Under that rule, the liability of the agent and previously undisclosed principal is joint and several rather than alternative.

> Undoubtedly an agent who makes a contract in his own name without disclosing his agency is liable to the other party. The latter acts upon his credit and is not bound to yield up his right to hold the former personally, merely because he discloses a principal who is also liable. The principal is liable because the contract was for his benefit, and the agent is benefited by his being presumedly the creditor, for there can be but one satisfaction. But it does not follow that the agent can afterwards discharge himself by putting the creditor to his election. Being already liable by his contract, he can be discharged only by satisfaction of it, by himself or another. So the principal has no right to compel the creditor to elect his action, or to discharge either himself or his agent, but can defend his agent only by making satisfaction for him.

*Grinder v. Bryans Rd. Bldg. & Supply Co., supra* at 698, quoting *Beymer v. Bonsall,* 79 Pa. 298, 300 (1875).

In drafting the Restatement of Agency, the American Law Institute believed Pennsylvania's to be the better reasoned rule, but felt bound by the judicial precedent of the majority of other jurisdictions. *See Grinder v. Bryans Rd. Bldg. & Supply Co.,* at 691–701, quoting Restatement of Agency § 435 explanatory notes, (Temp. draft 4, 1929); W. Seavey, *Studies in Agency* § 210 (1949) (American Law

Institute "was coerced by the cases"). Legal commentary approving the minority rule is summarized in *Grinder,* at 703–06, and includes J. Story, *Agency* § 295, at 378 (3d ed. 1846); F. Wharton, *Agency & Agents* § 473, at 307–08 (1876); and F. Mechem, *Agency* § 159, at 105 (4th ed. 1952) (conventional rule deemed illogical and unfair).

▮ The *Grinder* court at pages 704–06 quotes extensively from Ferson, *Undisclosed Principals,* 22 U. Cin. L. Rev. 131, 142–44 (1953), to explain the illogic of the election rule and the unassailable logic of the Pennsylvania rule:

> [T]he third party can hold an undisclosed principal; he can also hold the agent; and, yet, he is entitled to only one performance. What is the theory of the situation? It seems clear that when the agent of an undisclosed principal makes a contractual promise to a third person the result is not *one* obligation. It is *two* obligations. The agent is bound because he makes a contract that in terms is binding on him. The principal is bound owing to a different set of facts, *viz.* he assented—*i.e.,* offered to be bound if and when the agent should make such a contract. The condition is met when the agent makes his contract. The principal and agent each consented to assume, and thus created, his own obligation. The obligations are not of identical origin, and they bind different obligors even though each obligation would be broken or satisfied according to whether the obligee gets what is coming to him. . . .
>
> It should not be necessary to argue at this late date that a principal and his agent are not identical. But it was approved learning in earlier days. . . . Out of the false assumption that only one obligation was created by the agent's contract, has come a century of confusion and disagreement with regard to the liabilities of principal and agent.
>
> When it is recognized that the third person acquires several rights against the principal and agent, there does not seem to be any reason of logic, justice or expediency why he should not have every advantage that accrues to any one else who has more than one right. Specifically his attempt to hold one obligor should not exonerate another obligor. And a merger of his claim against one into a

judgment against that one should not take away his right against the other obligor. The several rights of a third person who has contracted with the agent of an undisclosed principal are comparable to the several rights acquired by a "creditor–beneficiary" for whom a contract has been made. In that kind of a case, *A* promises *B* that *A* will pay *B*'s debt to *C*. The result is that *C* gets a right against *A*, and, of course, retains his right against *B*. In that situation, it is settled law that *C* can recover against either *A* or *B*. *C*'s attempt to hold one does not exonerate the other and *C*'s procurement of a judgment against one does not exonerate the other. *C* is, of course, entitled to only one payment of what is coming to him and insofar as he has been paid by one obligor it reduces the extent, but does not cut off the existence, of his claim against the other. [Footnotes omitted.] [Emphasis in text.]

We agree with this analysis and hold a creditor is entitled to take judgment against both an agent and his previously undisclosed principal, although the creditor may have only one satisfaction.

We note the Minnesota Supreme Court followed *Grinder* in *Engelstad v. Cargill, Inc.,* 336 N.W.2d 284 (Minn. 1983). The Oregon Court of Appeals has also indicated approval of the minority rule in *Carter v. Forstrom,* 80 Or. App. 213, 722 P.2d 23 (1986) (dicta). *Accord, Ore. S.S. Corp. v. D/S A/S Hassel,* 137 F.2d 326, 330 (2d Cir. 1943) (election rule termed a "harsh doctrine, resting at most on a rather barren logic"); *Johnson & Higgins v. Charles F. Garrigues Co.,* 30 F.2d 251, 254 (2d Cir. 1929) (Hand, J., dissenting) ("no logical basis" for election rule); *Joseph Denunzio Fruit Co. v. Crane,* 79 F. Supp. 117 (S.D. Cal. 1948) (no reason to retain election rule in light of Federal Rules of Civil Procedure).

Smiley argues abandonment of the election rule will result in a windfall to Crown Controls. Crown Controls will not receive a windfall but rather satisfaction of its debt. On the other hand, the election rule results in a windfall to one debtor. Typically, as here, the creditor does not take discovery of defendants' assets before judgment is entered and discerns the judgment debtor's financial worth through

supplemental proceedings. Thus the creditor is not in a position to make a considered decision at the time of the purported election. Nor is there any more of a windfall than in any other joint and several liability case.

Furthermore, as stated in *Grinder,* at 695, the election rule is not relied upon by people when they structure their business transactions:

> It is not a rule with respect to which predictability of the result of its application should remain stable in order to protect past transactions. Indeed, from the standpoint of the principal and agent, the rule predicts only that an election must be made, but because the election is that of the creditor, the result of the election is not necessarily predictable. As Grinder would urge in the instant matter, the election could occur by operation of law and unintentionally from the creditor's standpoint. It is . . . a "technicality."

(Citation omitted.)

We also believe our opinion has been presaged by the many exceptions created by the courts to mitigate the harshness of the election rule. *See, e.g., Glover v. Tacoma Gen. Hosp., supra* (in case involving vicarious liability, settlement and release of agent does not release principal if plaintiff not likely to be fully compensated by agent); *Turnbull v. Shelton, supra* (no election because creditor did not know of agency relationship); *Maxwell's Elec., Inc. v. Hegeman–Harris Co., supra* (plaintiff permitted to make election after trial); *Letterman v. Tacoma,* 53 Wn.2d 294, 333 P.2d 650 (1959) (an act done through ignorance or mistake does not constitute an election of remedies unless the defendant can show an estoppel); *Ross v. Hagen,* 51 Wn.2d 165, 316 P.2d 896 (1957) (subsequent action not barred by election of remedies doctrine where plaintiff reaped no benefit from previous action and defendant suffered no substantial detriment therein).

Smiley argues Crown Controls could have raised its claims against him in the Oregon action. Smiley appears to be rearguing collateral estoppel, although he has not assigned error to the trial court's ruling against him on that

issue. We therefore will not consider it. RAP 10.3(a)(3).

Lastly, Smiley contends the court erred in awarding prejudgment interest. This issue is raised for the first time on appeal and will not be addressed. RAP 2.5(a). Smiley assigned error in this court to finding of fact 2.8 regarding a conditional tender, but he never raised the issue of prejudgment interest in the trial court.

Smiley's request for attorney fees on appeal is denied. The judgment is affirmed and remanded for entry of judgment against Smiley and NADS, jointly and severally.

CALLOW and REVELLE, JJ. Pro Tem., concur.

Reconsideration denied July 8, 1987.

Review granted by Supreme Court November 4, 1987.