[Nos. 62029-1-I; 62721-0-I.   Division One.   February 16, 2010.]

SeaHAVN, Ltd., *Appellant*, v. Glitnir Bank, *Respondent*.

*Joseph E. Bringman, Amanda J. Beane, Harry H. Schneider Jr.*, and *Kate Vaughan* (of *Perkins Coie LLP*), for appellant.

*Richard C. Yarmuth, Jordan Gross*, and *Rachel L. Hong* (of *Yarmuth Wilsdon Calfo PLLC*) (*Scott T. Nonaka* and *Ivana J. Cingel* of *O'Melveny & Myers LLP*, of counsel), for respondent.

¶1 SCHINDLER, C.J. — A British Virgin Islands limited liability company, SeaHAVN Ltd. appeals the trial court's decision to dismiss its breach of contract lawsuit against an Icelandic bank, Glitnir Bank, for lack of personal jurisdiction under Washington's long-arm statute, RCW 4.28.185. SeaHAVN contends that based on the execution of a nondisclosure agreement in Seattle and Glitnir's other limited contacts in Washington, the court erred in finding no specific or general jurisdiction over Glitnir under our long-arm statute. SeaHAVN also contends the court erroneously concluded that an award of attorney fees under the long-arm statute was mandatory. In the alternative, SeaHAVN asserts the court abused its discretion in determining the amount of fees. Because the trial court did not err in deciding Washington does not have jurisdiction over Glitnir or in awarding attorney fees to Glitnir, we affirm.

## FACTS

¶2 The facts are not in dispute. Formed in 1997, SeaHAVN is a British Virgin Islands limited liability company. SeaHAVN is not registered to do business in Wash-

ington. SeaHAVN's principal place of business is in Monte Carlo, Monaco. SeaHAVN owns and operates factory freezer fishing trawlers in the North Atlantic and Indian Oceans and off the coast of West Africa. SeaHAVN's primary markets are in Europe, Asia, and West Africa. SeaHAVN's chief executive officer and general counsel, James A. Wexler, works on contract and lives in the Seattle area. SeaHAVN's chief operating officer, Arne Longva, also lives in Seattle.

¶3 Glitnir, formerly Islandsbanki hf., is a public limited company formed under the laws of Iceland. Glitnir's headquarters are located in Reykjavik, Iceland. Glitnir provides comprehensive banking services only in Iceland but maintains offices in Europe, Asia, and Canada.

¶4 Glitnir has no physical presence in Washington. Glitnir has never maintained an office in Washington or registered to do business in the state. Glitnir has never paid taxes or maintained a bank account, a mailing address, or an agent for service of process in Washington. In addition, Glitnir's advertising does not target Washington residents.

¶5 In August 2004, SeaHAVN's London based broker, Nigel Christie of RP&C International Ltd., met in London with the chief executive officer of Glitnir, Bjarni Armannsson, to discuss obtaining a loan to purchase two factory freezer trawlers, the *Poseidon* and the *Pegasus*, from a Greek shipping company, Laskaridis Shipping Ltd., for $16 million each. Laskaridis owned and operated the fishing trawlers in the Southeast Pacific and Southern Oceans. SeaHAVN planned to use the trawlers to expand its fishing operations to the Southeast Pacific and Southern Oceans.

¶6 On August 25, Christie sent an e-mail to Glitnir business manager Kjartan Olafsson in Iceland. The e-mail included as an attachment an "Executive Summary" of SeaHAVN's plan to acquire the two trawlers from Laskaridis, together with projected revenues. The Executive Summary company profile notes SeaHAVN's "European and Mauritanian based SeaHAVN management loca-

tions in Las Palmas; Spain; Monaco; Nouakchott and Nouadhibou, Mauritania." The conclusion of the Executive Summary states:

> We have attempted to keep this Executive Summary brief and will be able to elaborate on the points mentioned or provide detailed information, where necessary. A detailed business plan is available with complete management, resource assessments, feasibility study and financial projections.

¶7 In the e-mail, Christie says that he will call Olafsson the following week "to discuss this further and would very much like to set up a meeting between you and your colleagues and Jim Wexler and myself in the early part of September, so that Jim can lay out the proposed acquisition and build programme in much more detail." Christie also says that he and RP&C are bound by a confidentiality agreement with SeaHAVN and asks Glitnir to "treat the attached information, and any further information that we may send you, in the utmost confidence." Christie then states that "[i]n due course, I would ask you to sign a confidentiality agreement that mirrors the one which we have signed."

¶8 Following a series of e-mails and telephone calls between Christie and Glitnir, Christie told Wexler that Glitnir agreed to "sign a confidentiality agreement once they receive it." In an e-mail to Wexler, Christie suggested that Wexler send the confidentiality agreement "as an email attachment to me, and address it to: Islandsbanki, Kirkjusandi, IS-155 Reykjavik, Iceland, and I will forward it on to the right persons there." According to Wexler, "[p]rior to our meeting in Seattle on September 22, 2004, the document had been revised several times by Glitnir's attorneys and SeaHAVN to its final form, which was mutually acceptable."

¶9 On September 22, Glitnir loan officer Helgi Eiriksson met with Wexler at a hotel in Seattle for approximately two and one-half hours to discuss SeaHAVN's plan to acquire the two trawlers from Laskaridis. At the meeting, Wexler,

on behalf of SeaHAVN, and Eiriksson, on behalf of Glitnir, signed a "Notice of Confidentiality/Non-Circumvention/Non-Competition" agreement (nondisclosure agreement or NDA).

¶10 The NDA is on SeaHAVN letterhead. The letterhead identifies Wexler as the chairman and chief executive officer of SeaHAVN. The address on the letterhead is "c/o Moore Stephens Services, L'Estoril Avenue Princesse Grace, Monte Carlo, 98000 Monaco." The NDA letter is addressed to "Islandsbanki, Kirkjusandi, IS-155 Reykjavik, Iceland, c/o Nigel Christie Executive Director, RP&C International Ltd., 56 Green Street, Mayfair, London WIK 6RY."

¶11 Under the terms of the NDA, Glitnir agreed to keep confidential the information provided by SeaHAVN to obtain financing to purchase the fishing trawlers. The NDA letter provides in pertinent part:

> As we discussed with Nigel Christie, RP&C International, Ltd., please review, sign and return this confidentiality/non-circumvention/non-competition letter regarding materials and information submitted to you by Mr. Christie that are related to our project to purchase one or more 105meter operating factory freezer fishing trawler (the 'vessel') and construct new 50meter fishing vessels in the United States. By signing below you acknowledge that receipt of all information or materials from SeaHAVN or its agents including materials and information provided to you by Mr. Christie so far and/or hereafter provided to you, including but not limited to all information related to certain guarantors and their guarantees that may be utilized in funding/financing our proposed purchase/operation of the vessel(s), will be kept confidential by you and your associates, attorneys, advisors and agents including any corporations, partnerships or other business entities that you and/or your associates may do business under. Such information and materials are being provided for your review in connection with your consideration of providing funding for our purchase/operation/construction of the vessel(s). Neither the information contained in such information or materials in whole or in part may be reproduced without the express written permission of SeaHAVN, Ltd., unless intended for internal use at Islandsbanki

in connection with your determination of providing funding/financing for SeaHAVN Ltd.

By accepting such materials and information you acknowledge that you have agreed and will continue to agree to the terms of this notice and agree that you shall be responsible for safeguarding and maintaining the confidentiality of such information and materials. Further, you hereby acknowledge and agree that all such information and materials provided by SeaHAVN, Ltd. and/or its directors, officers, agents, attorneys or other representatives, are confidential and proprietary information of SeaHAVN, Ltd., that if not safeguarded may cause substantial economic damage to SeaHAVN, Ltd. In light of the involvement of some of your directors, officers, shareholders, partners, associates and agents in the fishing industry you realize the necesity [sic] of taking precautions AND SHALL TAKE SUCH PRECAUTIONS to guarantee that none of such material and information, . . . shall be utilized other than in your determination of providing funding/financing to SeaHAVN and shall not utilize the information contained therein or provided to you subsequently by SeaHAVN, Ltd. or its agents for any other purpose or for the benefit of any other client . . . . All materials are to be returned immediately upon the request of SeaHAVN, Ltd. or its agent, other than those required to be kept by the bank according to Icelandic law or internal policies.

This agreement shall not apply to information that Islandsbanki can verify it has previously known from sources other than SeaHAVN, Ltd. . . .

¶12 After the September 22 meeting, Wexler provided additional information to Eiriksson by e-mail and by phone about the plan to purchase the fishing trawlers from Laskaridis. Wexler stated that SeaHAVN wanted to "secure a loan for at least one and preferably all four operating 105m factory freezer trawlers currently managed by the Laskaridis Group." According to Wexler, Laskaridis had agreed to provide "long-term on-going seamless management and marketing services with SeaHAVN with the option to SeaHAVN to assume full management and marketing" and that acquisition of the trawlers "will provide immediate cash flows . . . ."

¶13 After Eiriksson met with the Glitnir credit managers on October 28, he informed Wexler by e-mail that Glitnir needed additional information about SeaHAVN's finances, including an audit performed in Monaco, and additional information about SeaHAVN's equity financing and the proposed guarantor. Eiriksson said that he and one of the Glitnir credit managers planned to travel to Seattle in November to meet with Wexler.

¶14 On November 18, Eiriksson and credit manager Gunnar Engilbertsson met with Wexler and SeaHAVN's fishery consultant Jeffrey June in Seattle to discuss SeaHAVN's plan to acquire the fishing trawlers from Laskaridis. After the meeting, Wexler, Longva, and June continued to exchange e-mails with Eiriksson and Engilbertsson about SeaHAVN's plan to use the trawlers and expand its operations to the Southeast Pacific and Southern Oceans.

¶15 In December, SeaHAVN submitted a loan application to Glitnir to purchase the two fishing trawlers from Laskaridis. In the "PROJECT ORGANIZATION AND STRUCTURE" section of the loan application, SeaHAVN states that it plans to form a new Icelandic limited liability company and will transfer registration of the two fishing trawlers from Vanuatu to "the jurisdiction acceptable to Islandsbanki." SeaHAVN also states that it plans to form a subsidiary in Iceland to manage and market fishing production from the two trawlers.

¶16 The loan application states in pertinent part:

> SeaHAVN, Ltd. (Iceland) shall be organized as a new Holding Company pursuant to the laws of Iceland and shall establish offices in Iceland as required by the laws of Iceland and to coordinate with Islandsbanki. It is SeaHAVN, Ltd.'s understanding that such corporation will be tax neutral in Iceland or may qualify as an International Trading Company and be taxed at the maximum rate of 5% of net income.

> For purposes of limitation of liability, SeaHAVN, Ltd. (Iceland) shall either establish new vessel-owning companies or shall become the 100% shareholder of the existing vessel-owning

companies upon purchase of the vessels. At this moment, both vessels are owned by Vanuatu corporations and the vessels are flagged and registered in Vanuatu. As required by Islandsbanki[,] SeaHAVN, Ltd. (Iceland) agrees to register and flag the vessels in the jurisdiction acceptable to Islandsbanki.

In addition, SeaHAVN, Ltd. (Iceland) shall establish a wholly-owned subsidiary in Iceland, SeaHARVEST, Ltd., (Iceland) to manage and market production of the vessels. Each 105 [meter] vessel owning company shall contract for management and marketing with SeaHARVEST Ltd. (Iceland) and SeaHARVEST, Ltd. (Iceland) shall subcontract with Unimed Glory AS to assist with management and marketing as a condition of the 25% Seller financing arrangement for purchase of the vessels.

*SeaHARVEST, Ltd. (Iceland)* and its subcontractor *Unimed Glory AS* shall be responsible for the day-to-day operation and support of the 105 [meter] vessels including arranging all fuel, supplies, crew, food and sales. SeaHARVEST, Ltd. (Iceland) shall coordinate all administrative functions including accounting, legal, personnel, crew, fuel and supply contracting and creation of all management reports with their respective parent companies.

¶17 On December 2, Engilbertsson sent a fax to Sea-HAVN and Wexler "c/o Moore Stephens Services L'Estoril Avenue Princesse Grace, Monte Carlo, 98000 Monaco," confirming that Glitnir was considering SeaHAVN's loan application to purchase the two factory freezer fishing trawlers for $32 million with the option to purchase two other trawlers from Laskaridis. Engilbertsson states that the loan application was scheduled for review by the Glitnir credit committee on December 10 "for approval to enter into formal negotiation with SeaHAVN. . . ." On December 11, the credit committee requested additional information from SeaHAVN about its equity and the guarantor.

¶18 On December 21, Engilbertsson notified SeaHAVN by e-mail that Glitnir had decided to not proceed with SeaHAVN's loan application. "As we have discussed many times, there are inherent weakness with financial position

of Seahavn [sic] as well as the guarantor. Your e-mail this morning and the letter from the seller did not enhance our confidence in the whole deal."

¶19 On March 3, 2005, Wexler sent an e-mail to Eiriksson and Engilbertsson stating that while he was in Panama to inspect two other trawlers owned by Laskaridis, the *Odysseus* and the *Pegasus*, he learned that Glitnir loaned money to a SeaHAVN competitor, Scottish fishing operator Sinclair, to purchase the *Poseidon* and another trawler from Laskaridis. In the e-mail, Wexler says that he believed Sinclair "submitted a request to you regarding funding their acquisition of the [fishing trawler] Poseidon and the same sister vessel that formed the basis for our business plan in December during the time we likewise were going through your loan committee processes . . . ." Wexler described the additional steps that SeaHAVN had taken to revise "our structure to accommodate your suggestions" and said he "would like the opportunity to discuss with you those details as well as how to reconcile the awkward situation . . . ."

¶20 On November 30, 2007, SeaHAVN filed a lawsuit against Glitnir in King County Superior Court. The crux of SeaHAVN's lawsuit is that Glitnir breached the terms of the NDA by impermissibly using the confidential information SeaHAVN provided to Glitnir. The complaint alleges (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) promissory estoppel; (4) violation of the Consumer Protection Act, chapter 19.86 RCW; (5) negligent misrepresentation; (6) breach of a confidential relationship; (7) tortious interference with economic relations; (8) violation of the Uniform Trade Secrets Act, chapter 19.108 RCW; and (9) breach of fiduciary duty. SeaHAVN alleged that Washington has personal jurisdiction over Glitnir "pursuant to RCW 4.28.185 arising out of specific business transacted in the State of Washington, an agreement reached with a party in the State of Washington, and breach of such agreement." SeaHAVN also alleged Washington has jurisdiction because Glitnir conducts "business in King County, Washington."

¶21 On December 20, SeaHAVN notified Glitnir of the lawsuit by registered letter. On January 30, 2008, SeaHAVN served Glitnir with the complaint in Iceland.

¶22 Glitnir filed a motion to dismiss for lack of personal jurisdiction under Washington's long-arm statute and forum non conveniens.[1] In support, Glitnir submitted a declaration from Kristin Thordardottir, the managing director of Glitnir United Kingdom and South Europe. In opposition, SeaHAVN submitted declarations from Wexler and June.

¶23 The court granted Glitnir's motion to dismiss for lack of personal jurisdiction. The court ruled that executing the NDA in Seattle and Glitnir's other limited and minimal contacts with Washington did not justify either specific or general jurisdiction over the dispute between SeaHAVN and Glitnir. In dismissing the lawsuit, the trial court outlined the undisputed facts supporting the conclusion that Washington did not have jurisdiction over Glitnir.

> We don't have very much that we disagree about in terms of facts. It's [sic] is established, I believe, that this is a lawsuit between two foreign corporations; that neither is a resident or a citizen of the State of Washington. The plaintiff is a British Virgin Islands company with its place of business in Monte Carlo, Monaco. It is in the fishing business, in international waters in the South Pacific. From the documents I received, the principal customer base is in Europe, Asia, and West Africa. Defendant Glitnir is an Icelandic organization with its principal place of business apparently in Iceland.
>
> The business transaction at issue here, and the one that did occur in Seattle, Washington, was the entry into a nondisclosure agreement that was connected with the credit application by the plaintiff to Glitnir. That agreement was executed in Seattle, Washington.
>
> The plaintiff and defendant met two times in Seattle. And the defendant communicated with the plaintiff through its contract representative in Seattle [Mr. Wexler].

---

[1] Glitnir also argued lack of jurisdiction based on ineffective service of process.

I think the records establish that [Mr. Wexler] is not an employee, but is hired by SeaHAVN, being their CEO [chief executive officer] on a contract basis. . . . And obviously Mr. Wexler has substantial expertise in international business transaction; and apparently he is thought of as the CEO here, in Seattle. But in fact, it also appears that [Mr. Wexler's] management and leadership are the sole presence of SeaHAVN in Seattle.

. . . .

The loan application and transaction that was contemplated by the parties was for the purchase of two Greek vessels owned and operated in the South Pacific, and they were to be operated by SeaHAVN in the South Pacific. . . . [T]here certainly was a loan agreement element that related to the vessels being operated and managed by an Icelandic company, an Icelandic corporation. [SeaHAVN is] not . . . a resident, or citizen, or taxpayer in the State of Washington. . . . And certainly there was the signing of an agreement in Washington. This is what this case is all about. There was certainly an agreement on nondisclosure . . . . [T]here was a contract signed. Nobody disputes that . . . . But, there is nothing inherent in the Seattle location that compels or directed the execution of that contract in this location. It was, as I think both parties acknowledged, a contract that could have been entered anywhere.

¶24 Glitnir filed a motion under the long-arm statute for attorney fees of $711,263.82. The attorney fee request included $514,058.90 for the San Francisco attorneys, $182,144.09 for an Icelandic attorney, and $15,060.83 for Seattle counsel. SeaHAVN argued the request was unreasonable and should be denied. SeaHAVN also argued the hours were excessive, duplicative, and inadequately documented. In support, SeaHAVN relied on an expert declaration from attorney Arthur W. Harrigan Jr. In Harrigan's opinion, the number of hours billed by Glitnir's lead San Francisco attorneys and by the Icelandic attorney were unreasonable. Without regard to the reasonableness of the rates charged, Harrigan concluded that an award of approximately $185,000 was reasonable.

¶25 The court awarded $185,000 in attorney fees and costs. The court found Harrigan's analysis persuasive and

that SeaHAVN's expenditure of $123,062.48 in attorney fees also supported an attorney fee award of $185,000.

¶26 SeaHAVN appeals the judgment and order dismissing the lawsuit against Glitnir for lack of jurisdiction and the award of attorney fees.

## ANALYSIS

*Dismissal for Lack of Jurisdiction*

¶27 Where, as here, the facts are undisputed, personal jurisdiction is a question of law that we review de novo. *MBM Fisheries, Inc. v. Bollinger Mach. Shop & Shipyard, Inc.*, 60 Wn. App. 414, 418, 804 P.2d 627 (1991). The plaintiff has the burden of establishing jurisdiction but need only make a prima facie showing. *CTVC of Hawaii Co. v. Shinawatra*, 82 Wn. App. 699, 707, 919 P.2d 1243 (1996). We treat the allegations of the complaint as true. *MBM Fisheries*, 60 Wn. App. at 418.

A. *Specific Jurisdiction under Washington's Long-Arm Statute*

¶28 Washington's long-arm statute, RCW 4.28.185, authorizes the court to exercise jurisdiction over a nonresident defendant to the extent permitted by the due process clause of the United States Constitution. *MBM Fisheries*, 60 Wn. App. at 423.

¶29 SeaHAVN alleges Washington has specific personal jurisdiction over Glitnir based on the transaction of business within the state under RCW 4.28.185(1)(a), or based on tortious acts committed within the state under RCW 4.28.185(1)(b). RCW 4.28.185 provides in pertinent part:

(1) Any person, whether or not a citizen or resident of this state, who in person or through an agent does any of the acts in this section enumerated, thereby submits said person, and, if an individual, his personal representative, to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any of said acts:

(a) The transaction of any business within this state;

(b) The commission of a tortious act within this state;

. . . .

(3) Only causes of action arising from acts enumerated herein may be asserted against a defendant in an action in which jurisdiction over him is based upon this section.

■ ¶30 To exercise specific personal jurisdiction over a foreign corporation under RCW 4.28.185, the following three-part test must be met:

"(1) The nonresident defendant or foreign corporation must purposefully do some act or consummate some transaction in the forum state; (2) the cause of action must arise from, or be connected with, such act or transaction; and (3) the assumption of jurisdiction by the forum state must not offend traditional notions of fair play and substantial justice, consideration being given to the quality, nature, and extent of the activity in the forum state, the relative convenience of the parties, the benefits and protection of the laws of the forum state afforded the respective parties, and the basic equities of the situation."

*Shute v. Carnival Cruise Lines*, 113 Wn.2d 763, 767, 783 P.2d 78 (1989) (quoting *Deutsch v. W. Coast Mach. Co.*, 80 Wn.2d 707, 711, 497 P.2d 1311 (1972)).

1. *Purposeful Acts*

a. *Transaction of business within the state*

■ ¶31 In order to establish specific personal jurisdiction under RCW 4.28.185(1)(a), SeaHAVN must first show that Glitnir "purposefully avail[ed] itself of the privilege of conducting activities within the forum state, thereby invoking the benefits and protections of its laws." *Walker v. Bonney-Watson Co.*, 64 Wn. App. 27, 34, 823 P.2d 518 (1992) (citing *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S. Ct. 1228, 2 L. Ed. 2d 1283 (1958)).

■■ ¶32 Jurisdiction exists where the contacts create a substantial connection with the forum state.

Thus where the defendant "deliberately" has engaged in significant activities within a State, *Keeton* v. *Hustler Magazine*,

*Inc.*, [465 U.S. 770,] 781, [104 S. Ct. 1473, 79 L. Ed. 2d 790 (1984)] or has created "continuing obligations" between himself and residents of the forum, *Travelers Health Assn.* v. *Virginia*, 339 U. S. [643,] 648, [70 S. Ct. 927, 94 L. Ed. 2d 1154 (1950)], he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by "the benefits and protections" of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475-76, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985).

¶33 Whether contacts establish purposeful availment is determined by the quality and nature of the activities, not by the number of acts or mechanical standards. *CTVC*, 82 Wn. App. at 710. The purposeful availment requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." *Burger King*, 471 U.S. at 475 (quoting *Keeton*, 465 U.S. at 774; *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 299, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980)).

¶34 A plaintiff can establish purposeful availment by showing the initiation of a transaction outside the state " 'in contemplation that some phase of it will take place in the forum state.' " *CTVC*, 82 Wn. App. at 711 (quoting *Griffiths & Sprague Stevedoring Co. v. Bayly, Martin & Fay, Inc.*, 71 Wn.2d 679, 684, 430 P.2d 600 (1967)). And a defendant may purposefully act in the forum state, even though the defendant did not initiate contact, " 'if a business relationship subsequently arises.' " *CTVC*, 82 Wn. App. at 711 (quoting *Sorb Oil Corp. v. Batalla Corp.*, 32 Wn. App. 296, 299, 647 P.2d 514 (1982)).

¶35 However, the mere execution of a contract with a resident does not establish purposeful availment. *MBM Fisheries*, 60 Wn. App. at 423 (citing *Burger King*, 471 U.S. at 478-79). In determining whether entering into a contract established purposeful availment, the court

must examine the circumstances of the entire transaction. The court must evaluate prior negotiations, contemplated future consequences, the terms of the contract, and the parties' actual course of dealing.

*CTVC*, 82 Wn. App. at 711 (citing *MBM Fisheries*, 60 Wn. App. at 423 (citing *Burger King*, 471 U.S. at 478-79)).

¶36 SeaHAVN claims that Washington has personal jurisdiction over Glitnir under RCW 4.28.185(1)(a) based on "specific business transacted in the State of Washington, an agreement reached with a party in the State of Washington, and breach of such agreement." Specifically, SeaHAVN relies on the fact that the NDA was signed in Seattle, two meetings took place in Seattle, and Wexler and Jane provided confidential financial information during the meetings and e-mail concerning the feasibility of fishing in the Southeast Pacific and Southern Oceans. SeaHAVN alleges Glitnir breached the NDA by using the confidential information to loan money to Scottish fishing company Sinclair to purchase the fishing trawlers owned by Laskaridis. The transaction between SeaHAVN and Glitnir, including the parties' course of dealing and the purpose of the proposed transaction, does not establish that Glitnir purposefully availed itself of the privilege of conducting business in Washington.

¶37 SeaHAVN is incorporated in the British Virgin Islands, with its principal place of business in Monaco. Glitnir is an Icelandic bank, with its principal place of business in Iceland. The undisputed purpose of SeaHAVN's relationship with Glitnir was to obtain financing from the Icelandic bank to purchase the two fishing trawlers from Greek shipping company Laskaridis. SeaHAVN's London based broker, Christie, initially met with a Glitnir bank representative in London to discuss obtaining a loan to purchase the fishing trawlers. The contemplated future consequence of obtaining funding to acquire the two trawlers from Laskaridis was to expand SeaHAVN's fishing operations to the Southeast Pacific and Southern Oceans.

¶38 Following a series of communications with Christie, Glitnir agreed to enter into the NDA and keep the business information provided by SeaHAVN in connection with its loan application confidential. At SeaHAVN's request, Glitnir traveled to Seattle so that Wexler could provide more detailed information about the proposed acquisition. At the meeting on September 22, Wexler, on behalf of SeaHAVN, and Eiriksson, on behalf of Glitnir, signed the NDA. While the NDA requires Glitnir to not disclose confidential information, it does not create an obligation related to the transaction of business in Washington. And as the parties acknowledged below, the NDA could have been executed anywhere.

¶39 SeaHAVN and Glitnir met for a second time in Seattle in November to discuss further SeaHAVN's proposed business plan and finances. In early December, SeaHAVN submitted a loan application to Glitnir. Glitnir rejected SeaHAVN's application on December 21 because SeaHAVN did not provide Glitnir with "audited financial statements and adequate information related to SeaHAVN's financial condition, equity financing, and proposed guarantor." There is no dispute that Glitnir made all decisions about SeaHAVN's loan application in Iceland and ultimately transacted no business with SeaHAVN. Likewise, the alleged decision to finance Scottish fishing company Sinclair to purchase two factor freezer fishing trawlers from Laskaridis took place in Europe.

¶40 The cases SeaHAVN cites and relies on to argue purposeful availment, *Precision Laboratory Plastics, Inc. v. Micro Test, Inc.*, 96 Wn. App. 721, 981 P.2d 454 (1999) and *Haisten v. Grass Valley Medical Reimbursement Fund, Ltd.*, 784 F.2d 1392 (9th Cir. 1986), are distinguishable. In *Precision*, the court held the plaintiff established purposeful availment because the foreign defendant purposely negotiated an ongoing business relationship with a Washington company to purchase at least three million custom-made medical test vials over a three year period. *Precision*, 96 Wn. App. at 727-28.

¶41  In *Haisten*, the court analyzed the "economic reality" of the nonresident defendant's activities and concluded that the "substance, not form, of the defendant's activities are dispositive." *Haisten*, 784 F.2d at 1398. The nonresident insurance company in *Haisten* sought to avoid California law by physically conducting all transactions outside of the state. *Haisten*, 784 F.2d at 1397. But the court held that the company purposely directed its activities at the state because the "sum and substance" of the transactions was to insure California doctors against malpractice within the state. *Haisten*, 784 F.2d at 1400. Here, the NDA did not create an ongoing business relationship between Glitnir and SeaHAVN in Washington. Nor did the NDA create any future obligation in Washington.

¶42  SeaHAVN also cites *John Does v. CompCare, Inc.*, 52 Wn. App. 688, 763 P.2d 1237 (1988) and *Crown Controls, Inc. v. Smiley*, 47 Wn. App. 832, 737 P.2d 709 (1987), to argue that the e-mails and the telephone calls between SeaHAVN and Glitnir establish purposeful availment. But communication by telephone and e-mail is not dispositive. The "salient factor" is whether the defendant negotiates an ongoing business relationship with a Washington company that has substantive effects and created future obligations in Washington. *Precision*, 96 Wn. App. at 727 n.5. Moreover, *Does* and *Crown* are distinguishable.

¶43  In *Does*, victims of sexual abuse sued the Diocese of Lafayette (Diocese), Louisiana, and three court officials. The lawsuit alleged the Diocese negligently placed and supervised its priest in Spokane, Washington. On appeal, the court held that Washington acquired jurisdiction over the Diocese under the long-arm statute. The court cited a number of purposeful contacts, including payment of the expenses to relocate the priest to Spokane, continuing to pay the priest a subsidy, payment of psychiatric treatment and hospitalization, and telephone conversations between the Louisiana Diocese and the priest and the Spokane diocese. *Does*, 52 Wn. App. at 697-98. In reaching the conclusion that the Diocese engaged in purposeful conduct

in Washington, the court relied on the direct benefit to the Diocese of the discipline and treatment of the priest in Washington. *Does*, 52 Wn. App. at 698.

¶44 In *Crown*, the court held that the nonresident defendant's telephone contacts to purchase products from a Washington company were sufficient to establish jurisdiction in Washington. *Crown*, 47 Wn. App. at 837. Here, unlike in *Crown*, Glitnir did not initiate contact to purchase products from SeaHAVN in Washington. SeaHAVN initiated contact with Glitnir in London through its London based broker, Christie.

¶45 On this record, SeaHAVN cannot establish purposeful availment for purposes of exercising specific jurisdiction over Glitnir under RCW 4.28.185(1)(a) on the grounds that Glitnir transacted business in Washington by signing the NDA in Seattle.[2]

b. *Commission of tortious acts within the state*

¶46 SeaHAVN also argues that Glitnir committed tortious acts that establish specific personal jurisdiction in Washington under RCW 4.28.185(1)(b). SeaHAVN asserts that Glitnir violated the NDA by misrepresenting it had no conflict of interest and would not disclose confidential information.

¶47 Under RCW 4.28.185(1)(b), a tortious act occurs in Washington when the injury occurs within our state. *Grange Ins. Ass'n v. State*, 110 Wn.2d 752, 757, 757 P.2d 933 (1988). An injury "occurs" in Washington for purposes of the long-arm statute "if the last event necessary to make the defendant liable for the alleged tort occurred in Washington." *MBM Fisheries*, 60 Wn. App. at 425.

---

[2] In a statement of supplemental authority, SeaHAVN cites *Data Disc, Inc. v. Systems Technology Associates*, 557 F.2d 1280 (9th Cir. 1977) in support of its argument that Glitnir is subject to personal jurisdiction under RCW 4.28.185(1)(a). In *Data Disc*, the defendant company's contacts with the forum state were far more significant than here. After execution of a contract and purchase order in California, the defendant company visited California several times and one of its engineers worked at the company in California. *Data Disc*, 557 F.2d at 1287-88.

¶48 SeaHAVN alleges Glitnir made misrepresentations in the NDA by asserting "that it had no conflicts of interest and was not doing business with any competitor of SeaHAVN . . ." and it would not use the confidential information provided by SeaHAVN to benefit a competitor. The "last event necessary" allegedly occurred when Glitnir used SeaHAVN's confidential information to fund the Scottish fishing company's acquisition of two fishing trawlers from Laskaridis.[3] Because the alleged misrepresentations did not occur in Washington, we conclude the trial court did not err in ruling that Glitnir was not subject to jurisdiction under RCW 4.28.185(1)(b).

¶49 SeaHAVN's reliance on *Resnick v. Rowe*, 283 F. Supp. 2d 1128, 1138 (D. Haw. 2003), to argue that the harm was directed at SeaHAVN in Washington is unpersuasive. In *Resnick*, a nonresident buyer allegedly breached an agreement reached in another state to purchase a golf course in Hawaii. *Resnick*, 283 F. Supp. 2d at 1133-34. The court held that the "express aiming" requirement of the federal effects test was satisfied because the alleged misrepresentations were either made in Hawaii or were directed at the escrow officer in Hawaii. *Resnick*, 283 F. Supp. 2d at 1137. But here, unlike in *Resnick*, where at least some of the alleged harm was directed at Hawaii, none of Glitnir's allegedly tortious acts were aimed at or occurred in Washington.[4]

### 2. *Connection of the Cause of Action to the Forum State*

¶50 The second part of the *Shute* test requires a nexus between the cause of action and the defendant's

---

[3] While SeaHAVN appears to argue that it suffered harm in Washington because the company is "Washington-based," as a general rule a business entity suffers harm at its principal place of business. *Dole Food Co. v. Watts*, 303 F.3d 1104, 1113 (9th Cir. 2002); *Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1486 (9th Cir. 1993). SeaHAVN is not a Washington corporation. SeaHAVN's principal place of business is in Monte Carlo, Monaco.

[4] In addition, SeaHAVN cannot show that Glitnir committed an intentional act expressly aimed at Washington as required under the federal test. *Dole Food Co.*, 303 F.3d at 1113; *see also Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000) (requiring "brunt" of harm suffered in forum state).

activities in the forum state. *Shute*, 113 Wn.2d at 769-72; *Raymond v. Robinson*, 104 Wn. App. 627, 640, 15 P.3d 697 (2001). Washington courts use the "but for" test to determine whether a cause of action against a nonresident defendant arises from, or is connected with, the defendant's acts in the forum state. *Raymond*, 104 Wn. App. at 640. Jurisdiction is proper if the events giving rise to the claim would not have occurred "but for" the solicitation of business in the forum state. *CTVC*, 82 Wn. App. at 719. As previously noted, here, the alleged breach of the NDA and misrepresentations took place in Europe, not in Washington.

### 3. *Fair Play and Substantial Justice*

¶51 In determining the third part of the *Shute* test, fair play and substantial justice, we consider the quality, nature, and extent of Glitnir's activities in Washington, the relative convenience of maintaining the action here, the benefits Washington law affords, and the basic equities. *Shute*, 113 Wn.2d at 767.

¶52 Glitnir's activities in Washington were very limited, and the relative convenience and basic equities do not favor SeaHAVN. The decision by Glitnir to reject SeaHAVN's loan application was made in Iceland. Glitnir allegedly breached the NDA in Iceland, London, or Scotland. Requiring Glitnir to defend the lawsuit in Washington would create a substantial burden on Glitnir, and Washington has no particular interest in resolving the dispute between these two foreign corporations. The trial court did not err in deciding that requiring Glitnir to defend in Washington offends traditional notions of fair play and substantial justice.

### B. *General Personal Jurisdiction*

¶53 Under RCW 4.28.080(10), the court may assert general jurisdiction over a nonresident corporation "doing business within this state." RCW 4.28.080(10) allows a court to assert jurisdiction over disputes that are unrelated to the defendant corporation's activities within the forum state. *MBM Fisheries*, 60 Wn. App. at 418. The statute

confers general jurisdiction over a nonresident defendant corporation that transacts business "that is substantial and continuous, and of such a character as to give rise to a legal obligation" in this state. *Crose v. Volkswagenwerk Aktiengesellschaft*, 88 Wn.2d 50, 54, 558 P.2d 764 (1977).

¶54 It is undisputed that in 2004, Glitnir and Bank of America made loans to two Washington fishing companies. The loans comprised less than one percent of Glitnir's outstanding loans. In addition, Glitnir employees made occasional trips to Washington to develop business relationships in the international fishing industry. SeaHAVN also points to a Uniform Commercial Code (UCC) filing in Washington to secure collateral held by a nonresident debtor. Citing *Provident National Bank v. California Federal Savings & Loan Ass'n*, 819 F.2d 434, 438 (3d Cir. 1987), SeaHAVN contends the trial court erred in refusing to exercise general jurisdiction under RCW 4.28.080(10). We disagree.

¶55 In *Provident*, a California bank maintained an account with a bank in Pennsylvania and wired money to that bank account "every business day." *Provident*, 819 F.2d at 438. The Third Circuit held that the California bank was subject to personal jurisdiction in Pennsylvania based on the defendant's continuous and daily use of the bank account in Pennsylvania, the fact that the funds transferred to and maintained in the forum state belonged to the bank, and the purposefulness of the bank's activities. *Provident*, 819 F.2d at 438. The court in *Provident* concluded that the deposits were the "bread and butter" of the California bank's business and supported exercising general jurisdiction even if the percentage of the bank's business in the state was small. *Provident*, 819 F.2d at 438.

¶56 Unlike in *Provident*, Glitnir's two Washington loans, its occasional trips to develop business, and a single UCC filing in Washington do not establish the substantial and continuing business relationship necessary to assert general jurisdiction under RCW 4.28.080(10). Consequently,

we conclude SeaHAVN did not meet its burden to establish general jurisdiction under RCW 4.28.080(10).

¶57 The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with the rules governing unpublished opinions.

BECKER and APPELWICK, JJ., concur.